**Estate of Albert NALASCHI, Deceased.**

**Appeal of Eugene Nalaschi, Executor.**

Superior Court of Pennsylvania.

Argued Feb. 25, 2014.

Filed April 11, 2014.

Nicholas E. Fick, Scranton, for appellant.

BEFORE: GANTMAN, P.J.,
DONOHUE and STABILE, JJ.

OPINION BY DONOHUE, J.:

Eugene Nalaschi ("Eugene") appeals from the decree entered on June 19, 2013 by the Court of Common Pleas of Lackawanna County, Orphans' Court Division, granting the petition of Charles Witaconis, Esq. ("Witaconis") allowing the probate of the April 25, 2011 will of Albert Nalaschi, Sr. ("Decedent") and revoking the letters testamentary issued with respect to Decedent's January 28, 2010 will. We affirm.

Decedent died on July 6, 2012. Decedent was survived by eight children, three of whom were from his first marriage to Delores Nalaschi—Albert Nalaschi, Jr., James Nalaschi ("James"), and Leo Nalaschi, and five of whom were from his second marriage to Marion Nalaschi—Anthony Nalaschi, Eugene, Louise Lokuta ("Louise"), Cheryl Wilson ("Cheryl"), and Dean Nalaschi. The controversy in this matter arises out of two wills executed by Decedent. The first will, dated January 28, 2010 ("the 2010 Will"), named Eugene the executor and Decedent's daughter Louise the sole beneficiary. The second

will, dated April 25, 2011 ("the 2011 Will"), named Witaconis the executor and Decedent's son James the sole beneficiary.

Around July 11, 2012, the Register of Wills of Lackawanna County accepted the 2010 Will for probate and issued letters testamentary to Eugene, the executor named in that will. On July 27, 2012, Witaconis petitioned the Lackawanna County Court of Common Pleas, Orphans' Court Division, to show cause why letters testamentary should not be revoked for the 2010 Will based on the existence of the 2011 Will. Subsequently, Witaconis filed a second petition to compel the probate of the 2011 Will. In his answer to both of these petitions, Eugene asserted that the 2011 Will was invalid, in part, because Decedent lacked testamentary capacity at the time of the execution of the 2011 Will and because the 2011 Will was the product of undue influence by James. On June 19, 2013, after hearing the testimony of both parties, the trial court issued a decree revoking the letters testamentary issued with respect to the 2010 Will and allowing probate of the 2011 Will. The trial court found that Decedent had the testamentary capacity to execute the 2011 Will and that the 2011 Will was not the product of undue influence.

Eugene then filed a timely notice of appeal. He presents the following two issues for our review:

I. Did the lower court err as a matter of law and/or abuse its discretion in finding that the Decedent, Albert Nalaschi, had testamentary capacity and/or was competent on April 25, 2011 to execute a Will?

II. Did the lower court err as a matter of law and/or abuse [its] discretion in finding that the Decedent, Albert Nalaschi, was not subject to undue influence by James Nalaschi?

Appellant's Brief at 4.

 The appropriate scope and standard of review on appeal from a decree of the Orphans' Court adjudicating an appeal from probate is as follows:

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Bosley*, 26 A.3d 1104, 1107 (Pa.Super.2011) (internal citations omitted).

 Under Pennsylvania law, "[a]ny person 18 or more years of age who is of sound mind may make a will." 20 Pa. C.S.A. § 2501. In making a will, an individual may leave his or her property to any person or charity, or for any lawful purpose he or she wishes, unless he or she "lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." *In re Johnson's Estate*, 370 Pa. 125, 127, 87 A.2d 188, 190 (1952). If an individual challenges a will on any of these bases, the burden is on the proponent of the will to present evidence of the formalities of probate. *In re Clark's Estate*, 461 Pa. 52, 59, 334 A.2d 628, 631 (1975). Once the proponent presents this evidence, a presumption of validity arises, and the burden shifts to the person contesting the will to prove that the testator lacked mental capacity, or the will was obtained by forgery, fraud, or undue influ-

ence, or was the product of an insane delusion. *See In re Bosley*, 26 A.3d at 1107.

Eugene first alleges that the trial court erred when it found that Decedent had testamentary capacity and was competent to execute the 2011 Will. Appellant's Brief at 11–23. Eugene relies on several examples in 2010 and early 2011 to demonstrate Decedent's lack of testamentary capacity. *Id.* at 12–23. For example, from early 2010 to January 2011, Decedent lost nearly 40 pounds of weight, which was a possible indicator of dementia. N.T., 2/21/13, at 22. In March 2010, Decedent reported his daughter Cheryl to the police, accusing her of stealing money from him. N.T., 1/30/13, at 94–95. In July 2010, while Decedent was speaking with Detective Renee Castellani ("Detective Castellani") about Cheryl stealing from him, Decedent told Detective Castellani that he had stopped taking his medications. *Id.* at 158. After speaking with Decedent, Detective Castellani referred Decedent's case to the Area Agency on Aging. *Id.* at 157. As a result, Mary McAndrew ("McAndrew"), an Aging Care Manager at the Area Agency on Aging, began monitoring Decedent in July 2010. N.T., 1/8/13, at 68–69. McAndrew testified that when she began monitoring Decedent, she would sometimes find him disheveled, hung-over, and agitated. *Id.* at 64, 70–71. In September 2010, Decedent accused Louise, another one of his daughters, of stealing food and money from him. *Id.* at 133. Also in September 2010, Decedent missed an appointment with his primary care physician, Doctor Michael Jalowiec ("Dr. Jalowiec") because he got lost on the way to his office. N.T., 2/21/13 at 26–27. In March of 2011, Decedent attempted to take a $2,300 cash advance from his credit card and instead wrote the check for $23,000. N.T., 1/30/13, at 112. Additionally, when providing the names of his children for the 2011 Will, he spelled Cheryl's name incorrectly as "Sheryl," and despite the fact that both Cheryl and Louise were married, he used their maiden names. N.T., 1/8/13, at 32–33.

Finally, in support of his assertions, Eugene relies heavily on the testimony of Doctor Eugene Turchetti ("Dr. Turchetti"). Appellant's Brief at 20–22. Dr. Turchetti reviewed all of Decedent's records and opined that Decedent suffered from alcohol-related dementia. N.T., 4/8/13, at 7–8, 39. Based on his review of Decedent's records, he contended that Decedent was not competent to execute the 2011 Will. *Id.* at 11. Dr. Turchetti based his opinion on his belief that it is not possible to determine competence at one single point in time because dementia is a disease that progresses over time. *Id.* at 10. Rather, Dr. Turchetti asserted that after examining Decedent's records, he believed that Decedent's behavior over the course of 2010 and early 2011 indicated that Decedent had a mental illness that had progressed to the point that by April 25, 2011, there was enough information to conclude Decedent was not competent to execute a will. *Id.*

Testamentary capacity exists when a testator is aware of the natural objects of his bounty, the composition of his estate and what he wants done with it, even if his memory is impaired by disease. *In re Bosley*, 26 A.3d at 1111–12. The testator "need not have the ability to conduct business affairs." *Id.* at 1112 (citation omitted). Courts evaluate testamentary capacity on the date of the execution of the contested will. *Id.* at 1112. "Evidence of such state of mind may be received for a reasonable time before and after execution as reflective of decedent's testamentary capacity. This information can be supplied by lay witnesses as well as

experts." *In re Agostini's Estate,* 311 Pa.Super. 233, 457 A.2d 861, 867 (1983).

██ The record, when viewed in the light most favorable to Witaconis, supports the trial court's conclusion that Decedent had testamentary capacity. Although Eugene cites several questionable actions by Decedent in 2010, he provides little evidence of Decedent's incompetence from the time reasonably close to the execution of the 2011 Will. *See* Appellant's Brief at 12–23. Moreover, Eugene fails to explain how his evidence of Decedent's mental deficiencies demonstrates that Decedent was not "aware of the natural objects of his bounty, the composition of his estate and what he wants done with it." *See In re Bosley,* 26 A.3d at 1111–12.

██ Furthermore, as this Court has previously stated,

> impressions of the Decedent on the very date he executed his will are more probative of the Decedent's testamentary capacity than those of someone . . . who never met the decedent and formulated an opinion of Decedent's mental state based solely on medical records.

*Id.* at 1112. In this case, most of the evidence that Eugene cites in support of his argument that Decedent lacked testamentary capacity to execute the 2011 Will is from 2010. Appellant's Brief at 12–23. This evidence is not from a reasonable time before or after the execution of the 2011 Will, but in some instances over a year before Decedent executed the 2011 Will on April 25, 2011. *See In re Agostini's Estate,* 457 A.2d at 867. Additionally, Eugene relies heavily on the testimony of Dr. Turchetti, even though Dr. Turchetti never actually met with Decedent, but rather only reviewed his records. *See* N.T., 4/8/13, at 7–8; *In re Bosley,* 26 A.3d at 1112.

Conversely, Witaconis provides ample testimony that Decedent was competent when he executed the 2011 Will. For example, Attorney James Zipay ("Zipay"), an Assistant Lackawanna County Solicitor with the Elder Law Project, met with Decedent in March 2011, approximately one month before he executed the 2011 Will. N.T., 1/8/13, at 6. Decedent met Zipay regarding drafting a power of attorney. *Id.* at 8. Zipay testified that whenever he meets with clients, he first determines that they have the capacity to execute a legal document. *Id.* at 7. Zipay determined in March 2011 that Decedent was competent to execute a legal document. *Id.* at 10–12.

Likewise, Witaconis testified that when Decedent came to his office in late March 2011 seeking his services to draft a will, Witaconis also determined that Decedent had testamentary capacity. *Id.* at 24. Witaconis stated that on the date Decedent executed the 2011 Will, Decedent understood the makeup of his estate and to whom he was bequeathing his property. *Id.* at 25. Therefore, Witaconis believed that Decedent was competent when he executed the 2011 Will.

Additionally, Stephen Gedrich, a Managing Supervisor at the Area Agency on Aging, met with Decedent in person on March 14, 2011, and reported that he had no concern about Decedent's mental competency. *Id.* at 39–40. Furthermore, even though McAndrew testified that she experienced some difficulty dealing with Decedent, she also stated that every time she spoke with him he was "cognitively intact" and that she never would have referred him to Zipay if she had any concerns about his legal competency. *Id.* at 66.

Finally, Dr. Jalowiec testified that he examined Decedent on April 18, 2011, that he had no concerns about Decedent's mental capacity at that time, and that he had

no functional limitations other than a respiratory problem. N.T., 2/21/13, at 5–9. Therefore, we find no abuse of discretion in the trial court's determination that Decedent had testamentary capacity when he executed the 2011 Will.

 Eugene next challenges the 2011 Will on the basis that Decedent executed it under the undue influence of James. Appellant's Brief at 24. The contestant bears the burden of proving undue influence. *In re Bosley*, 26 A.3d at 1107–08 (citing *Estate of Clark*, 461 Pa. 52, 334 A.2d 628 (1975)). In meeting this burden, the contestant must establish, by clear and convincing evidence that:

> (1) the testator suffered from a weakened intellect at the time the will was executed; (2) there was a person in a confidential relationship with the testator; and (3) the person in the confidential relationship received a substantial benefit under the challenged will.

*Id.* at 1108 (citation omitted). Once the contestant establishes these three elements, "the burden shifts back to the proponent to prove the absence of undue influence by clear and convincing evidence." *Id.* (citation omitted). We find that the trial court properly concluded that Eugene failed to establish a *prima facie* case of undue influence.

 Eugene argues that the 2011 Will is invalid due to undue influence because James was going to receive a substantial benefit from the 2011 Will. Appellant's Brief at 26. It is clear that the trial court properly concluded that James was set to receive a substantial benefit from the 2011 Will. Decedent named James as the sole beneficiary of the estate in the 2011 Will, which included Decedent's home.

 Eugene also argues that Decedent suffered from a weakened intellect. Appellant's Brief at 26. Eugene bases this argument on the same evidence he attempted to use to prove that Decedent lacked testamentary capacity. *Id.* at 27. This Court has previously stated, "[w]eakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution." *In re Bosley*, 26 A.3d at 1112. While Pennsylvania courts "have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." *In re Estate of Fritts*, 906 A.2d 601, 607 (Pa.Super.2006) (citations omitted). Importantly, in an undue influence case, "a trial court has greater latitude to consider medical testimony describing a decedent's condition at a time remote from the date that the contested will was executed." *Id.* (citation omitted). We will not revisit the trial court's conclusions when they rest on legally competent and sufficient evidence. *Id.*

 In this case, Eugene presented evidence that at certain points in 2010, Decedent was confused and forgetful. Indeed, Decedent accused two of his daughters of stealing from him, he got lost on the way to an appointment at his doctor's office, and he became agitated at times when dealing with the Area Agency on Aging. *See* N.T., 1/8/13, at 70–71; N.T, 1/30/13, at 94–95, 133; N.T., 2/21/13 at 26–27. Conversely, there is ample evidence from Zipay, Witaconis, Gedrich, McAndrew, and Dr. Jalowiec that around the date of execution of the 2011 Will, Decedent was lucid and knew what he was doing. *See* N.T., 1/8/13, at 10–12, 24–25, 39–40, 66; N.T., 2/21/13 at 5–9.

Therefore, the record supports the trial court's finding that Decedent's behavior at

the time of execution of the 2011 Will was not "accompanied by persistent confusion, forgetfulness and disorientation." *See In re Estate of Fritts*, 906 A.2d at 607. Likewise, Decedent's behavior does not rise to the level of behavior this Court has previously found to constitute weakened intellect. *See Owens v. Mazzei*, 847 A.2d 700, 708–09 (Pa.Super.2004) (finding weakened intellect where Decedent wandered the neighborhood confused, left his home in a state of squalor, showed up at his bank only to sit and talk to no one, and went to a medical appointment unbathed). Therefore, the trial court properly concluded that Decedent did not suffer from a weakened intellect.

Finally, Eugene argues that a confidential relationship existed between Decedent and James. Appellant's Brief at 26. Eugene asserts that James had an overmastering influence over Decedent because James lived with and cared for Decedent and he threatened to leave Decedent and put him in a nursing home. *Id.* at 27. We find that the trial court did not err in finding that a confidential relationship did not exist between Decedent and James.

 This Court recently held that a confidential relationship exists when " 'the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed.' " *In re Estate of Boardman*, 80 A.3d 820, 823 (Pa.Super.2013) (quoting *Owens*, 847 A.2d at 709). A confidential relationship " 'is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.' " *In re Estate of Fritts*, 906 A.2d at 608 (citations omitted). Notably, a parent-child relationship does not prove the existence of a confidential relationship. *Id.*

 In this case, Eugene offers little evidence in support of the existence of a confidential relationship between Decedent and James. The only evidence Eugene offers of James exerting influence over Decedent was when James told decedent to hang up the phone on Cheryl or James would leave and Decedent would end up in a nursing home. Appellant's Brief at 27; N.T., 1/30/13, at 110.

Conversely, both Zipay and Witaconis testified that James did not exert any influence over Decedent during the making of the 2011 Will. Zipay testified that when he met with Decedent, he met with him alone because he insists on meeting with clients privately so that he can determine what they want without any influence from family members. N.T., 1/8/13 at 8. Likewise, Witaconis testified that that he too insists on meeting with his clients without any family members present and that he met with Decedent alone to determine the contents of the 2011 Will. *Id.* at 27. Lastly, James testified that he never met Witaconis, did not go to Witaconis's offices when Decedent discussed the 2011 Will with Witaconis, and he was not present in the room when Decedent signed the will. N.T., 1/30/13, at 14–15. James only drove Decedent to Witaconis's office on the date Decedent executed the 2011 Will because Decedent asked James to drive him to the office. *Id.* Accordingly, Eugene failed to prove that James exhibited overmastering power over Decedent. Thus, the trial court did not err in determining that no confidential relationship existed between Decedent and James.

Based on the foregoing, the trial court did not err or abuse its discretion in its determination that the 2011 Will was not

the product of undue influence. We therefore affirm.

Decree affirmed.