J-A12024-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF EDWARD V. SOKOLOWSKI, | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: DAVID SOKOLOWSKI, ADMINISTRATOR D.B.N.C.T.A. OF THE ESTATE OF EDWARD V. SOKOLOWSKI, DECEASED | : : : : | No. 1791 MDA 2014 |

Appeal from the Order entered October 6, 2014,
Court of Common Pleas, Luzerne County,
Orphans' Court at No. 4007-00554

BEFORE:  BOWES, DONOHUE and ALLEN, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED JULY 09, 2015**

David Sokolowski ("Petitioner"), administrator d.b.n.c.t.a.[1] of the Estate of Edward V. Sokolowski ("Decedent"), appeals from the October 6, 2014 order entered by the Luzerne County Court of Common Pleas denying his petition for the imposition of a constructive trust upon transfers of money and property from Decedent to Barbara Stanishefski ("Stanishefski") made in the final year of Decedent's life.  After careful review, we affirm.

The facts and procedural history relevant to this appeal are as follows. During his lifetime, Decedent was a priest in the Roman Catholic Church. Sometime in 1967, he became a priest at St. Mary's Czestochowa ("St. Mary's") in Swoyersville, Pennsylvania, where Stanishefski had served as a volunteer for his predecessors for several years.   Stanishefski was

---

[1]  **See** 20 Pa.C.S.A. § 3159.

approximately seventeen years old when Decedent came to St. Mary's. Her responsibilities at St. Mary's under Decedent involved emptying the money from collection envelopes and posting them, compiling reports for the Bishop, and balancing the books.

Following her graduation from high school, she began to work at RCA in Mountain Top, Pennsylvania, but continued to volunteer at St. Mary's helping Decedent.[2] According to Stanishefski, Decedent began having her write out, sign his name and distribute checks for certain church functions, which she did, at his direction.

Decedent retired in 1992 at the age of seventy-five. He invited Stanishefski to move into his house and live with him in Mountain Top and she accepted. In exchange for living there rent-free, Stanishefski was responsible for purchasing food and doing the cooking, cleaning, grocery shopping, errands and laundry. Decedent paid the utility bills. Stanishefski wrote checks and paid bills from Decedent's personal checking account at Decedent's direction, much like she did when she worked at St. Mary's. Sometimes Decedent signed checks in blank for Stanishefski to fill out and other times Stanishefski signed Decedent's name to checks, at his direction. According to Stanishefski, she made payments and filled out checks from Decedent's accounts only when so instructed by Decedent.

---

[2] In or around 1981, the position became a paid one for Stanishefski, with her earning $100 per month for her duties.

In a will executed in 1997, Decedent included a provision providing Stanishefski the option to purchase their shared residence for $95,000. In this will, Decedent left all of his tangible personal property inside of his home to his younger brother, Casimer Sokolowski, and two younger sisters, Geraldine Toone and Eleanor Lewczyk (collectively, "Decedent's siblings"), and named his siblings as residuary legatees. He named his brother as executor of his estate.

Decedent underwent back-to-back heart surgeries in 2001, following which Stanishefski provided greater assistance to him. Also in 2001, Decedent sold the house to Stanishefski for $70,000, consideration for which included a $40,000 purchase money mortgage. Shortly thereafter, Decedent amended his will, removing the then-irrelevant provision regarding the sale of the house to Stanishefski. Also in this version of the will, Decedent named Stanishefski as the beneficiary of his tangible personal property, permitting, but not requiring, her to distribute his personal property to his siblings; named his siblings as residuary legatees; and nominated his attorney, John D. Sieminski, Esquire ("Attorney Sieminski") as his executor, and Decedent's brother as successor executor. Decedent further executed a durable power of attorney, naming Attorney Sieminski as his agent therein, and a health care power of attorney, naming Stanishefski as his agent therein.

In 2005, Decedent's health began to deteriorate further, requiring the introduction of help from a home healthcare agency. The record reflects that Stanishefski signed the intake paperwork on Decedent's behalf. A few months later, Decedent forgave the $40,000 debt owed by Stanishefski for the purchase of the house.

In the final year of his life, Stanishefski deposited into her personal bank account several checks written from Decedent's accounts totaling $130,000. Stanishefski also provided payment from Decedent's personal accounts for coins allegedly purchased by Decedent, or by Stanishefski at Decedent's direction, during his lifetime. Decedent and Stanishefski lived together in the house until Decedent died on March 8, 2007 at the age of eighty-nine.

On October 30, 2008, Attorney Sieminski filed a Petition for Adjudication (Statement of Proposed Distribution) in the orphans' court. Pursuant to an agreement reached between Attorney Sieminski and Decedent's siblings, Sieminski requested that the orphans' court confirm and approve his first and final account as executor of Decedent's will; permit him to transfer all information pertaining to the administration of Decedent's estate to Decedent's brother as successor executor; discharge Attorney Sieminski as executor; and issue letters testamentary to Decedent's brother as successor executor of Decedent's estate. The orphans' court granted the petition on June 22, 2009. On June 29, 2009, however, the orphans' court

vacated the June 22 order as requested by Stanishefski, as Attorney Sieminski's petition erroneously stated that Decedent's siblings were the only parties with an interest in Decedent's estate, omitting that Stanishefski was also a beneficiary under Decedent's will. Stanishefski further asserted that the orphans' court erred by granting Attorney Sieminski's petition, as it provided for confirmation of the first and final account without first conducting an audit by the court. On September 3, 2009, the orphans' court confirmed the audit of the first and final account submitted by Attorney Sieminski as executor of Decedent's estate.

On March 5, 2010, Decedent's siblings, as residuary legatees of Decedent's estate, filed a petition seeking the imposition of a constructive trust (the "Petition"), naming Stanishefski and Attorney Sieminski as respondents. The Petition alleged, in relevant part, that Stanishefski had a confidential relationship with Decedent and, to the extent Decedent consented to purchases and payments made by Stanishefski on his behalf, he was mentally incompetent to do so. In their prayer for relief, Decedent's siblings requested that the orphans' court do the following:

> A. To declare a constructive trust upon the property belonging to [] Decedent which was wrongfully transferred by [] Stanishefski to herself or for her benefit and
>
> B. To declare [] Stanishefski as a trustee of said funds and other property and to require her to account therefore [sic] and to return those funds and other

> property aggregating $175,490.78[] to [] Decedent's estate and
>
> C. To grant such further relief as the [c]ourt may deem just and fair.

Petition, 3/5/10, at 10. Stanishefski filed an answer and new matter on March 30, 2010, asserting that the siblings' failure to challenge the first and final account and audit resulted in a bar to the above-claims based upon the running of the statute of limitations, res judicata, laches and an absence of jurisdiction over the matter in the orphans' court. Decedent's siblings filed a reply to the new matter on April 19, 2010.

At a proceeding held on July 14, 2011 before the orphans' court, Attorney Sieminski and the Decedents' siblings entered a stipulation, over Stanishefski's objection, to dismiss Attorney Sieminski as a respondent and discharge Attorney Sieminski as executor as Decedent's estate, replacing him with Decedent's brother as successor executor. On July 26, 2011, however, Decedent's brother renounced his right to serve as executor of Decedent's estate, requesting that the orphans' court instead issue letters of administration d.b.n.c.t.a. to Petitioner. Thereafter, on September 22, 2011, Decedent's siblings discontinued the action commenced by the March 5, 2010 Petition, and in its place, Petitioner filed a nearly identical petition, naming Stanishefski as respondent, on September 29, 2011. Stanishefski filed an answer on November 9, 2011.

The case ultimately came before the orphans' court for a bench trial on February 18, March 20, March 21, and April 29, 2014. Petitioner presented the testimony of four employees of the home healthcare agencies that worked with Decedent prior to his death, Attorney Sieminski and Decedent's brother, and called Stanishefski to testify as if on cross-examination. Stanishefski presented testimony from three of Decedent's friends – all of whom saw and interacted with Decedent between thirty days and one-to-two weeks of Decedent's death. Stanishefski testified on her own behalf.

On October 6, 2014, the orphans' court entered an opinion and order denying the request for the imposition of a constructive trust and reaching the following conclusions of law:

> 1. The testimony given by [] Stanishefski is found to be credible.
>
> 2. [] Stanishefski has established a prima facie case for valid gifts with respect to the house, coins and cash, and [] Petitioner has failed to rebut the presumption of a valid gift by clear, precise and convincing evidence,
>
> 3. There was no confidential relationship between [Decedent] and [] Stanishefski.
>
> 4. Since no confidential relationship existed, the burden does not shift to [] Stanishefski to show that the gifts were not a result of undue influence.

Orphans' Court Opinion, 10/6/14, at 4-5.

Petitioner filed a timely notice of appeal, followed by a court-ordered concise statement of errors complained of on appeal. The orphans' court filed a supplemental opinion in response.

On appeal, Petitioner presents the following issues for our review:

1. Did a confidential relationship exist between [] Decedent [] and [] Stanishefski?

2. Did [] Stanishefski[] meet her burden of proving by clear and convincing evidence that the five transfers to her of [] Decedent's property were valid, inter vivos gifts made by [] Decedent?

3. Was [Stanishefski] subject to a duty as agent of [] Decedent (1) to account for the coins purchased from Mint Fulfillment from January 1, 2006 until the death of [] Decedent on March 8, 2007 and (2) to justify the expenditures she made to a Discover credit card?

Petitioner's Brief at 2-3.

We begin by stating our standard of review:

The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the [o]rphans' [c]ourt's findings, our task is to ensure that the record is free from legal error and to determine if the [o]rphans' [c]ourt's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

*In re Estate of Bechtel*, 92 A.3d 833, 837 (Pa. Super. 2014) (citation omitted).

In his first issue on appeal, Petitioner asserts that the orphans' court erred by finding that a confidential relationship did not exist between Decedent and Stanishefski. Petitioner's Brief at 22. We have found the existence of a confidential relationship "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." *In re Estate of Nalaschi*, 90 A.3d 8, 15 (Pa. Super. 2014) (citation and internal quotation marks omitted). "A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." *Id.* (citation and internal quotation marks omitted).

According to Petitioner, "the uncontroverted evidence" presented at trial revealed that "Decedent was in a weakened physical and mental condition," could not care for himself, and was "dependent upon [Stanishefski] to provide the assistance necessary to his daily living and the management of his financial affairs," requiring a finding that a confidential relationship between Decedent and Stanishefski existed. Petitioner's Brief at 23. The record, however, does not support Petitioner's contentions. There is no question that Decedent became weaker physically as he neared the

end of his life and needed someone to care for him; Stanishefski admitted this in her testimony. *See* N.T., 4/29/14, at 69. However, while the testimony of Decedent's brother and the employees of the home healthcare companies that worked with Decedent suggested that towards the end of his life, Decedent suffered from a weakened intellect,[3] the testimony presented by Stanishefski painted Decedent as mentally competent until he died,[4] and

---

[3] For example, the registered nurse from Home Sweet Home Personal Care testified to her observation that Decedent was "forgetful" during the initial evaluation in 2005. N.T., 2/18/14, at 45. The registered nurse from Diversified Nursing, Inc. testified to her perception in 2006 that Decedent "was not able to make sound decisions regarding his safety," exhibited "episodes of confusion," and was not oriented as to time. *Id.* at 56, 70, 71. The personal care attendant from Home Sweet Home testified that during the construction of the sunroom at his home, Decedent did not seem to know what was going on. *Id.* at 94. Decedent's brother testified that Decedent began having memory lapses in 2000 and was incoherent during a visit in 2006. N.T., 3/20-21/14, at 139-40.

[4] For example, Eugene Marshall ("Marshall"), Decedent's general contractor and longtime friend, testified that he saw Decedent often in the months leading up to Decedent's death and that Decedent "was still there" and acted like himself. *Id.* at 224. Lawrence Kansky ("Kansky"), Decedent's podiatrist and close friend testified that he saw Decedent every thirty to sixty days between 1997 and the date of Decedent's death and that Decedent was "sharp as a tack" and "always" alert, including the last time he saw him. N.T., 4/29/14, at 4, 5, 8, 9. Kansky was a practicing attorney at the time of his testimony, and testified that he never had a concern about Decedent's mental competence. *Id.* at 11-12. Frances Ponko ("Ponko"), a friend of Stanishefski and Decedent, also described Decedent as "sharp," and testified that he was able to hold a normal conversation within two months of his passing. *Id.* at 27-28. She visited with Decedent approximately a week or two before he passed away and testified that she believed he was mentally competent at that time. *Id.* at 31. Stanishefski likewise testified that she never saw any change in Decedent's mental acuity. *Id.* at 69.

as stated above, the orphans' court found the testimony presented by Stanishefski to be credible.

Furthermore, although Decedent depended in large part on Stanishefski for his survival, the testimony of Stanishefski and her witnesses revealed that it was Decedent, not Stanishefski, who had the upper hand in the relationship. Stanishefski testified that anything she did with respect to Decedent's care, his finances and his home were done because Decedent told her to do so. She described him as "strict," and testified, "[I]f he said something, you went by it. He told me to do something this way, I would just do it, that's the way he wanted it." N.T., 4/29/14, at 52-53. She recounted one time when he was hospitalized that she had to leave work to get him Italian ice because that was what he wanted. *Id.* at 64-65. Stanishefski testified that she never refused to do anything Decedent asked of her, dating back to her teen years working for him at St. Mary's. *Id.* at 65. She considered him to be like a father to her. *Id.*

Marshall also described Decedent as a person who "was going to have his way." N.T., 3/20-21/14, at 217. He testified that he would not challenge Decedent – "if that's what he wanted, he wanted it." *Id.* Marshall observed Decedent towards the end of his life "still giving his orders," and that Decedent "controlled everything," including Stanishefski. *Id.* at 225.

Ponko similarly testified that "you did not tell [Decedent] what to do. … [H]e had his own mind, set in his ways. He might have listened to you but

when it came down to it, [Decedent] did what he wanted to do. He was stubborn. … Nobody talked him into anything." N.T., 4/29/14, at 28.

Based upon the testimony presented and the orphans' court's credibility determinations, there is no support for the conclusion that Stanishefski had "an overmastering influence" over Decedent or that Decedent was the "weaker party" in the relationship. *See In re Estate of Nalaschi*, 90 A.3d at 15. As such, we find no error or abuse of discretion in its conclusion that there was no confidential relationship that existed between Stanishefski and Decedent.

Petitioner next asserts that Stanishefski failed to satisfy her burden of establishing that certain transfers of money from Decedent to Stanishefski were valid inter vivos gifts.[5] Petitioner's Brief at 25. Assuming she met this burden, Petitioner asserts that he nonetheless sufficiently rebutted the presumption of the validity of the gifts by clear and convincing evidence

---

[5] Petitioner also asserts that Stanishefski failed to establish that the transfer of the house and coins from Decedent to Stanishefski were valid inter vivos gifts, but he includes no argument in support of these contentions. With respect to the house, he subsequently contradicts this claim by stating he "did not question in the court below the conveyance by [] Decedent of his residence to [Stanishefski] or his forgiveness of [Stanishefski's] mortgage indebtedness," and that he "does not question" the transfer of the house to Stanishefski from Decedent. *See* Petitioner's Brief at 25-26, 30-31. Petitioner makes no further mention of the coins in his argument of this issue. We therefore do not address either transfer herein. *See Penn-Am. Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 269 (Pa. Super. 2011) (en banc) (finding an argument waived based upon the appellant's failure to include any "corresponding discussion in the body of [its] brief"); Pa.R.A.P. 2119(a).

based upon the existence of a confidential relationship between Decedent and Stanishefski. *Id.*

"The elements required to establish a valid inter vivos gift are donative intent and delivery." *In re Estate of Petro*, 694 A.2d 627, 632 (Pa. Super. 1997) (citation omitted). The burden initially is on the recipient of the alleged gift to prove "by clear, precise, and convincing evidence" that it was a valid inter vivos gift. *Id.* Establishing that the donor and donee had a confidential relationship at the time of the gift would rebut the presumption of validity of the gift. *Id.* at 634. Where a confidential relationship is established, the burden shifts back to the donee "to prove that the gifts were fair and free from suspicion." *Id.*

Petitioner alleges that Stanishefski failed to prove a valid inter vivos gift for the following transfers:

- $50,000 check made out to "cash" from Decedent deposited into Stanishefski's account on or about September 15, 2006;

- $30,000 check made out to "cash" from Decedent deposited into Stanishefski's account on or about October 3, 2006;

- $20,000 of a $30,000 check made out to Decedent from his Wachovia Securities account deposited into Stanishefski's account on November 16, 2006;

- $30,000 check made out to Decedent from his Wachovia Securities account deposited into Stanishefski's account on March 1, 2007;

- 13 -

- A check payable from Decedent, signed by Stanishefski, to "Just Windows and More" for a renovation to the house.[6]

*See* Petitioner's Brief at 28-29.

The record reflects that Stanishefski sufficiently proved that the above transfers were valid inter vivos gifts from Decedent. Stanishefski testified that she made all of the above transfers at Decedent's direction. *See* N.T., 3/20-21/14, at 35, 41, 67, 75; N.T., 4/29/14, at 67-68. According to Stanishefski, they did not usually talk about money, and when he gave her the checks, he told her to put them into her account. N.T., 4/29/14, at 67. It was Stanishefski's understanding that he was giving the money to her as a gift. *Id.* Decedent told Stanishefski he did not want the money left in his account and "he wanted to be sure all of the bills were paid." N.T., 3/20-21/14, at 35. Stanishefski indicated that the checks made out to "cash" (for $50,000 and $30,000, respectively) went to the payment of bills for various home improvement projects. *Id.* She made many of these expenditures during Decedent's lifetime at his direction. *See id.* at 220, 222. Although the house technically belonged to Stanishefski at the time, she testified that she always considered it to be their shared home. N.T., 4/29/14, at 77-78. The record reflects that Decedent was the one who wanted the sunroom that was added onto the house and that Stanishefski "went along [with] him." *Id.* at 77; *see also id.* at 28-29; N.T., 3/20-21/14, at 221-22.

---

[6] The record reflects that Decedent wrote this check after he transferred the house to Stanishefski. *See* N.T., 3/20-21/14, at 12.

Decedent also stated on more than one occasion that he did not want the money to be in his accounts because he did not want his family to get the money – "[h]e said he gave them what he thought they deserved and that was it." *Id.* at 68. As we previously stated, the record reflects that Decedent's siblings stood to inherit the residue of his estate, which would have included money left in his personal accounts. He took the money out of these accounts and gave it to Stanishefski, instructing her to put it into her account because he did not want his family to get the money when he passed away, a clear indication that he wanted Stanishefski to have the money instead.

Petitioner asserts that the Decedent's signatures on the two checks for "cash" were "glaringly inconsistent" with his signature on the do not resuscitate order he signed on November 10, 2006, Petitioner's Brief at 29, but he presented no evidence at trial or otherwise to contradict Stanishefski's testimony that Decedent signed those checks. *See* N.T., 3/20-21/14, at 32-33. We have no information regarding the circumstances surrounding Decedent's signature of the do not resuscitate order – where he was, what he was doing at the time, or how he was feeling that day.

Petitioner further questions the strength of Decedent's signatures on all of the checks, as the evidence of record revealed that Decedent was extremely weak during the final months of his life. Petitioner's Brief at 29. Stanishefski testified, however, that Decedent pre-signed checks in blank

and left them for her to fill in at his direction, and there is no evidence that he did not do so with respect to the two checks made out to "cash." N.T., 2/18/14, at 144-45. With respect to the checks Decedent endorsed from his Wachovia securities account, Petitioner is correct that the personal care attendant from Home Sweet Home testified that because of Decedent's weakened condition, she did not believe he could have signed his name to a check towards the end of his life. N.T., 2/18/14, at 96-97. However, there was also testimony in contradiction. Ponko, for example, testified that Decedent held and blessed her three-month-old grandchild approximately two months before Decedent passed away. N.T., 4/29/14, at 28-29. Specifically regarding his ability to write, Kansky testified that although he did not see Decedent writing during his final days, he observed "letters … and a pen … and a pad" next to the chair in which the Decedent always sat, and it appeared to Kansky that Decedent "was actively writing[.]" *Id.* at 16. Moreover, Stanishefski consistently testified that she never did anything with respect to Decedent's finances unless he told her to and that she always followed the Decedent's instructions. *See* N.T., 2/18/14, at 135; N.T., 3/20-21/14, at 34-35, 41, 60, 67, 75. She further testified that Decedent always reviewed his checkbook and his financial statements – there were no financial transactions made of which he was unaware. N.T., 3/20-21/14, at 62. Stanishefski testified and her witnesses agreed – "he was the boss" and

"controlled everything." N.T., 2/18/14, at 145; N.T., 3/20-21/14, at 225; N.T., 4/29/14, at 28, 53.

The orphans' court found the testimony presented by Stanishefski credible, and this testimony supports a finding that Decedent delivered the above-listed money with donative intent. *See In re Estate of Petro*, 694 A.2d at 632. The orphans' court's findings are supported by competent evidence, are free from legal error, and are not based upon a "capricious disbelief of competent and credible evidence." *In re Estate of Bechtel*, 92 A.3d at 837. As we have already addressed the question of a confidential relationship between Stanishefski and Decedent, concluding that the record supported the orphans' court finding that none existed, no relief is due.

Lastly, Petitioner asserts that Stanishefski had a "duty as agent of [] Decedent" to account for coins purchased at Decedent's request and payments made to a Discover card. Petitioner's Brief at 31-33. Petitioner asserts that Stanishefski "acted as agent for [] Decedent" in purchasing approximately $90,000 worth of coins in the last year of his life and was thus required to account to Decedent's estate for the coins.[7] *Id.* at 31-32. Petitioner further asserts that Stanishefski failed to prove that Decedent was

---

[7] The record reflects that in the year leading up to his death, either Decedent himself or Stanishefski, at Decedent's direction, made large purchases of coins, which it is undisputed Decedent collected. N.T., 3/20-21/14, at 164, 185-89; N.T., 4/29/14, at 59-60, 74. Stanishefski and Ponko both testified that Decedent enjoyed giving coins (and jewelry) away to his close friends and family members and that he did in fact give away coins that he purchased. N.T., 4/29/14, at 30-31, 59-60.

the holder of a Discover credit card, and thus failed to prove that the twelve checks prepared by her on Decedent's behalf, paid to Discover, were for debts owed by Decedent.[8]  *Id.* at 32.

In support of this argument, Petitioner relies upon section 5610 of the Probate, Estates and Fiduciaries Code governing the requirement that a person appointed as power of attorney "file an account of his administration whenever directed to do so by the court and may file an account at any other time."  20 Pa.C.S.A. § 5610.  Petitioner further cites to case law involving a power of attorney and executors of an estate, respectively, breaching the duty to justify disbursements made by them.  *See* Petitioner's Brief at 33 (citing *In re Strickler's Estate*, 47 A.2d 134 (Pa. 1946); *In re Estate of Bechtel*, 92 A.3d 833).  The record reflects, however, that Attorney Sieminski, not Stanishefski, was appointed by Decedent as his power of attorney and executor of his will.  Stanishefski was not issuing

---

[8]  We observe that although Attorney Sieminski testified that he was unable to locate a Discover card in Decedent's name, Stanishefski presented evidence that Decedent did in fact hold a Discover credit card, and Stanishefski testified that the checks written from Decedent's bank account to Discover were for his credit card bills.  *See* Respondent's Exhibits 4-6; N.T., 3/20/21/14, at 116, 120-22; N.T., 4/29/14, at 75-76.  Petitioner contends that some of the credit card statements bear a different account number than are listed in the memo line on the checks to Discover for payment.  Petitioner's Brief at 32.  Petitioner did not advance this claim before the orphans' court.  Furthermore, the credit card number does not appear on the Discover statements included as exhibits in the certified record on appeal.  We therefore have no ability to address this contention.  *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

checks or making purchases as part of her legal obligation to Decedent, but did so, according to the orphans' court's credibility determinations, because Decedent asked her to. Apart from his bald statement that Stanishefski acted as Decedent's agent, Petitioner includes no argument equating Stanishefski's role with that of a power of attorney or provides any basis for this Court to conclude that section 5610 or the foregoing case law governed her actions.

Moreover, the evidence as it exists in this action indicates that there were no coins in Decedent's estate. The audit of the first and final account, confirmed absolutely by the orphans' court, does not include any coins. The only tangible personal property distributed accounted for therein is $1500 in "household furniture and personal affects," and Decedent's vehicle, worth $2,675. Audit, 9/4/09, ¶ 12. Petitioner did not appeal this order. Pursuant to section 3358 of the Probate, Estates and Fiduciaries Code, "No decree entered pursuant to this code shall be subject to collateral attack on account of any irregularity if the court which entered it had jurisdiction to do so." 20 Pa.C.S.A. § 3358. Thus, to the extent Stanishefski was, at the time of Decedent's death, in possession of coins that Decedent had owned and purchased prior thereto, the only challenge available to Petitioner would be to argue that the coins were an invalid inter vivos gift. As stated hereinabove, however, Petitioner waived this claim on appeal by failing to include any argument in support thereof. **See supra,** n.5.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/9/2015