J-A15040-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: THE ESTATE OF RUSSELL R. FELIX, DECEASED | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: CHRISTINA L. HEETER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1184 WDA 2022 |

Appeal from the Order Entered October 6, 2022
In the Court of Common Pleas of Venango County Orphans' Court at
No(s):  OCD No. 34 - 2022

BEFORE:  MURRAY, J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                **FILED: AUGUST 28, 2023**

Christina L. Heeter (Christina) appeals from the October 6, 2022 order of the Court of Common Pleas of Venango County (orphans' court) granting the petition of Tyler P. LeFevre (Tyler) to admit the will of Russell R. Felix (Decedent) to probate and revoking the letters of administration naming her as the administratrix of Decedent's estate.  We affirm.

**I.**

We glean the following facts from the certified record.  On January 13, 2022, Decedent died in a gas explosion and fire at his home.  Christina is the sole child of Decedent and Carol Felix, who died in 2015.  Christina has two adult children, Tyler and Grace LeFevre (Grace), with her first husband and

_____

[*] Retired Senior Judge assigned to the Superior Court.

two younger children, Dalton and Hanna, with her second husband, Dale Heeter (Dale).

Decedent lived on a farm that included several homes. Christina, Dale and their two children lived on the property until a March 2017 argument between Decedent and Dale prompted the family to leave. Decedent had virtually no contact with Christina and her younger children after that date. At the time of Decedent's death, Tyler, his wife, Michael LeFevre (Michael), and his wife's parents lived on the farm.

On January 20, 2022, Christina applied for and received letters of administration from the Register of Wills of Venango County. On March 29, 2022, Tyler filed in the Office of the Register of Wills a *pro se* petition to admit an unsigned copy of a will in Decedent's name to probate. On that same date, Tyler filed in the orphans' court a counseled petition for a rule to show cause why Christina's letters of administration should not be revoked and the will should not be admitted to probate. The Register of Wills did not take any action on the *pro se* petition but the orphans' court conducted a hearing on the petition for a rule to show cause on July 20, 2022.

The first witness at the hearing, Susan Hannon, serves as Recorder of Deeds, Register of Wills and Clerk of Orphans' Court for Venango County. She testified that in the course of her job, retiring notary publics will file their notarial journals with the court. As a result of this practice, she had notarial journals from Lynn McQuiston (McQuiston) dated June 2020. The journals

indicated that she notarized a signature of Decedent on June 15, 2020, for a document described as his "last will and testament." N.T., 7/20/22, at 4-5.

McQuiston also testified and said she did not recall Decedent appearing before her to sign his will, but she stated that if the will was signed in her presence, she would have noted it in her journal. When asked why the names of neither of the purported witnesses to the will appeared in her journal, McQuiston said if she had notarized the signature of the witnesses, her normal practice would have been to list the witnesses' names on one or more separate lines from the testator. She said it was possible that individuals signed documents but did not have their signatures notarized, in which case they would not be included in her journal.

Elizabeth Wegman (Wegman), the senior manager of fulfillment operations at Legal Zoom, testified that a document entitled "The Last Will and Testament of Russell Felix" was created on the Legal Zoom website on November 8, 2018. *Id.* at 14-18; Petitioner's Exhibit 1-2. The will provided that Tyler and Grace each stood to inherit 50 percent of Decedent's estate and named Tyler as executor. The email address 308Pizza@gmail.com was used for the services and a digital copy of the will was made available to the user through the Legal Zoom account.

Michael testified that she accompanied Decedent to the notary and signed the will as a witness on June 15, 2020. Michael familiarized herself with the contents of the will during the execution process as she was standing

next to Decedent and reading it while he initialed each page of the three copies of the will. Decedent told her that he was keeping the copies in his safe and she did not see the will again after witnessing it. Kimberly Jo Cousins, Michael's mother (Cousins), also observed Decedent sign the will and signed it herself as the second witness. Michael heard Decedent express to friends and family his dissatisfaction with his relationship with his daughter "[m]ultiple, hundreds" of times based on Decedent's feeling that Christina chose her husband over her father. *Id.* at 40-41. Decedent also informed Cousins on several occasions of his negative attitude towards Christina and his feeling that she should not inherit from his estate.

Tyler testified that in 2018, Decedent approached him for assistance in creating a will through Legal Zoom after seeing an ad for the service on TV. Tyler used the computer at his pizza shop, 308 Pizza, as well as his business's email address to create the will on Legal Zoom. He testified that he filled in the responses on the website but that each answer was Decedent's alone. Decedent used his credit card to complete the order. When the will was completed several days later, Tyler printed three copies and handed them to Decedent. Tyler saw the three copies of the will again after they were notarized and Decedent informed Tyler at that time that he placed the three copies in the safe in his house.

The copies of the wills were never located after Decedent's death. On the evening of the January 13, 2022 gas explosion and fire, Christina came to

Decedent's property and asked Tyler what he "wanted to do about the situation" and Tyler responded that "she wasn't involved" because Decedent had created a will. *Id.* at 46-47, 87. According to Tyler, Christina responded "[w]ell, we'll see about that." *Id.* A safe was recovered from the remains of the property by an insurance adjuster and given to Christina and Dale. After Tyler brought legal action to gain access to the safe, it was opened by a locksmith and no copies of the wills were found inside.

Tyler testified that Christina and Decedent had a long-running conflict dating back to when Decedent's wife died in 2015. In March of 2017, Decedent and Dale had an altercation in which Dale pointed a shotgun at Decedent and was removed from the property by the police. After that incident, Christina moved her family off the farm with Dale.[1] Decedent was particularly upset because he lost communication with his youngest grandson after his rift with Christina. Tyler heard Decedent say on multiple occasions that he wanted his estate to be distributed to Tyler and Grace as set forth in the will created on Legal Zoom.

Decedent's friends and acquaintances also testified regarding his fractured relationship with Christina. Danielle Fyock (Fyock), Decedent's

---

[1] Michael was also present during this incident and she recalled that Dale was very angry and the police were called. She did not recall seeing Christina on the farm property from the March 2017 incident until Decedent's death. Cousins likewise stated that after moving to the property in 2019, she never saw Christina.

supervisor at the bus company where he worked, stated that on many occasions, Decedent expressed his dissatisfaction with Christina, stemming ultimately from her decision to choose her husband over Decedent. He informed Fyock "that [Christina] would get nothing" from his estate. *Id.* at 59. Brian Koi, the landlord of the building that housed Tyler's pizza shop, testified that Decedent stated on multiple occasions that he "was dead to her" and he "was very adamant that she would not be the beneficiary of his estate." *Id.* at 69, 71-72. Sharon Chalmers (Chalmers), a long-time friend of Decedent and his wife, stated that she had numerous conversations with Decedent regarding his relationship with his daughter in which he expressed his displeasure with the fact that Christina's actions had deprived him of a relationship with his youngest grandson. Chalmers had nearly daily conversations with Decedent "[t]owards the end" of his life where he expressed his desire that Tyler and Grace would "get everything" and Christina would get nothing. *Id.* at 74, 77-78. He and his late wife had been concerned that Christina would sell the farm and they wanted it to stay in the family.

Christina also testified at the hearing. She stated that she lived on Decedent's farm for 20 years and she paid her parents approximately $200,000 in total for the property, including $32,000 for the initial purchase, $600 per month for various years to help with the mortgage and $1,000 monthly for two years when her father was injured. Christina testified that she and Decedent argued over whether he should make a will when he was

suffering from cancer and he assured her that she should not worry as she would "get everything." *Id.* at 123. Christina also described a "verbal contract" with her parents because she made a financial contribution towards the purchase of one of the houses on the property and, while title was placed in her parents' name, ownership of the property was effectively jointly shared. *Id.* at 123, 138.

Christina conceded that she had a falling out with her father in 2017 and that she only saw Decedent one time after she moved. She said that she had a good relationship with her parents prior to the 2017 incident, despite minor disagreements over the years. Christina was impeached based upon a letter that her mother wrote in 2014, prior to her death, and placed in the safe that was recovered from the property. The eight-page letter purported to describe various grievances that her mother had with Christina related to decisions Christina had made, the men she dated and married, and her withholding of her grandchildren. Christina admitted that she had hoped to "make amends" and "work things out" with her father prior to his death, but had not had the opportunity to do so. *Id.* at 131-32.

The orphans' court granted Tyler's petition to admit Decedent's will to probate and revoked Christina's letters of administration, finding ample evidence that Decedent assisted in drafting the will, signed it before witnesses at a notary public, showed the post-execution copies to Tyler and placed them in his safe in his home. Furthermore, Decedent's exclusion of Christina as a

beneficiary in favor of Tyler and Grace was consistent with the evidence of the rift between the two, as well as Decedent's numerous statements to friends and family regarding his intent to disinherit Christina. The orphans' court further noted that there was no credible evidence to suggest that the will was lost or destroyed or that he revoked any of the will's provisions.

Christina timely appealed and she and the orphans' court have complied with Pa. R.A.P. 1925.

## II.

Christina raises two issues on appeal: whether the orphans' court lacked subject matter jurisdiction to revoke the letters of administration and admit Decedent's will to probate and whether it abused its discretion in holding that Tyler, as the proponent of a lost will, rebutted the presumption that Decedent destroyed his will with the intent to revoke it.

## A.

We begin with Christina's challenge to the orphans' court's jurisdiction to enter the October 6, 2022 order.[2] She argues that the orphans' court lacked subject matter jurisdiction to consider the probate of the Legal Zoom will or

---

[2] Our standard of review concerning questions of subject matter jurisdiction is *de novo*, while our scope of review is plenary. **In re Estate of Huber**, 197 A.3d 288, 292 (Pa. Super. 2018). "Whether a court has subject matter jurisdiction over an action is a fundamental issue of law which may be raised at any time in the course of the proceedings, including by a reviewing court *sua sponte*." **Mazur v. Trinity Area School District**, 961 A.2d 96, 101 (Pa. 2008) (citation omitted); **see also Huber**, 197 A.3d at 292.

to remove her as administratrix and, in doing so, it usurped the exclusive authority of the Register of Wills to address these issues.

Without subject matter jurisdiction, a court lacks "authority to give judgment and one so entered is without force or effect." ***In re Estate of Huber***, 197 A.3d 288, 292 (Pa. Super. 2018) (citation omitted). Jurisdiction over decedents' estates and their fiduciaries is vested in the orphans' court division of the court of common pleas. 20 Pa.C.S. § 711(1), (12); ***Huber***, ***supra***. The orphans' court has jurisdiction to review the Register of Wills' grant of letters if a party appeals the Register of Wills' decision. 20 Pa.C.S. § 711(18).

As an initial matter, however, the Register of Wills "shall have jurisdiction of the probate of wills, the grant of letters to a personal representative, and any other matter as provided by law." 20 Pa.C.S. § 901. When a dispute arises concerning probate of a will or grant of letters, the Register of Wills may certify the record to the orphans' court for its determination. 20 Pa.C.S. § 907. Alternatively, on petition of any party in interest, the orphans' court may direct that the record be certified to allow for its resolution of the issue. ***Id.*** Additionally, when a party is aggrieved from the Register of Wills' probate of a will or another determination by the Register of Wills, she may bring an appeal to the orphans' court. 20 Pa.C.S. § 908 ("Any party in interest seeking to challenge the probate of a will or *who is otherwise aggrieved by a decree of the register*, or a fiduciary whose estate

- 9 -

or trust is so aggrieved, may appeal therefrom to the court within one year of the decree. . . .") (emphasis added). Finally, "[t]he register may amend or revoke letters testamentary or of administration granted by him not in conformity with the provisions of a will admitted to probate." 20 Pa.C.S. § 3181(b).

Christina relies on *Huber*, *supra*, and *In re Estate of Wisniewski*, 283 A.3d 811 (Pa. Super. 2022), in support of her argument that the orphans' court lacked jurisdiction to issue its October 6, 2022 order. In *Huber*, a residual beneficiary under a will filed a motion to appoint him as personal representative for the estate based upon the executrix's incapacity, and the executrix's attorney-in-fact filed a counter-petition requesting that letters of administration c.t.a. be issued to her. The orphans' court denied the residual beneficiary's motion, granted the attorney-in-fact's petition, and granted her letters of administration. On appeal, this Court noted that there was no indication on the record that the will was admitted to probate, nor was it apparent whether letters had been issued to any party by the Register of Wills. Likewise, there was no record of an appeal of an initial decision by the Register of Wills and the orphans' court had not acted under its statutory authority to remove the executrix. Therefore, because the Register of Wills—and not the orphans' court—had initial jurisdiction to grant letters of administration, we were constrained to vacate the court's order.

In **Wisniewski**, an attorney petitioned the Register of Wills for letters of administration for her deceased client's estate and the Register of Wills refused to accept the filing. She then filed a petition for letters of administration in the orphans' court. Even though the Register of Wills had never filed the petition, the orphans' court directed it to docket and backdate the initial petition, then treated the attorney's new petition as an appeal from a denial by the Register of Wills. We held that the orphans' court lacked jurisdiction to enter its order when no request was initially made with the Register of Wills for letters of administration, which had original jurisdiction over the matter. **Id.** at 813-14.

Unliked in **Huber** and **Wisniewski**, here, the record reveals that the Register of Wills exercised its original jurisdiction to issue letters of administration to Christina shortly after the Decedent's death. As the Register of Wills had already taken action to open the Decedent's estate, the orphans' court was empowered under Section 907, on petition of any party, to have the record certified to the orphans' court to resolve any dispute that arose. 20 Pa.C.S. § 907. In **Huber** and **Wisniewski**, no dispute had arisen on the record in front of the Register of Wills that could then be certified to the orphans' court—rather, the parties filed their initial petitions in the orphans' court before a will had been entered for probate or letters had been issued. Here, approximately two months after the Register of Wills had issued letters of administration to Christina, Tyler attempted to admit the will to probate

and petitioned the orphans' court to resolve the issue of whether probate of the lost will was appropriate in light of the letters of administration that had already been issued. Section 907 governs precisely this situation. **See also Estate of Osborne**, 525 A.2d 788, 791 (Pa. Super. 1987) (*en banc*) ("Thus, when a dispute arises regarding the Register's choice for the grant of letters, an interested party may either file a caveat with the Register *or petition the Orphans' Court division* for the matter to be transferred to the Orphans' Court for resolution.") (emphasis added).

Moreover, as Tyler argues, once the orphans' court exercised its jurisdiction to resolve the dispute and remove Christina as administrator, it was entitled to review all the evidence presented at the hearing and direct that the will be admitted to probate. **See id.** at 792-94 (holding that although the Register of Wills has authority to initially issue letters, once an administrator is removed, the orphans' court can select the new administrator and need not remand back to the Register of Wills for a new selection). Section 907 supports this exercise of authority: the orphans' court is required to "proceed to a determination of the issue in dispute" after the record is certified to it for review. 20 Pa.C.S. § 907. Here, the relevant dispute concerned not only whether Christina should continue as administrator but also whether the purportedly lost will should be admitted to probate. The orphans' court was well within its authority to resolve both questions put before it. Christina's first issue on appeal merits no relief.

**B.**

Next, we consider Christina's challenge to the substance of the order.[3] She argues that Tyler did not meet his burden to overcome the presumption that a will in a decedent's possession that cannot be found after his death was revoked or destroyed. Tyler was the only witness to testify to having seen Decedent's will after it was notarized, and his wife was the only other witness to have a conversation specifically regarding the location of the will. The will was not in Decedent's safe, which was the only place he had told witnesses that he would be keeping it. Other than opening the safe, no evidence was offered as to the search for the will after Decedent's death. Moreover, Christina asserts that testimony from witnesses about Decedent's stated intent to disinherit her was insufficient as a matter of law to rebut the presumption that he had destroyed or revoked the will.

---

[3] Our scope and standard of review of the orphans' court's findings of fact is well-established.

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Nalaschi*, 90 A.3d 8, 11 (Pa. Super. 2014) (quoting *In re Bosley*, 26 A.3d 1104 (Pa. Super. 2011)).

We begin with the relevant legal principles.

Our Supreme Court has repeatedly held that "where a [testator] retains the custody and possession of [his] will and, after [his] death, the will cannot be found, a presumption arises, in the absence of proof to the contrary, that the will was revoked or destroyed by the [testator]." To overcome that presumption, the evidence must be positive, clear and satisfactory. Moreover, to prevail over the presumption and establish the existence of a lost will, the proponent of the copy of the will must prove that: 1) the testator duly and properly executed the original will; 2) the contents of the will were substantially as appears on the copy of the will presented for probate; and 3) when the testator died, the will remained undestroyed or revoked by him.

*In re Estate of Maddi*, 167 A.3d 818, 822 (Pa. Super. 2017) (cleaned up; citations omitted). Here, Christina challenges only the third element of the test and we do not address the first two.[4]

When considering the third factor of the test, "[d]eclarations of intent, condition, and circumstances of family are insufficient to establish whether a

---

[4] Christina cites *In re Estate of Wilner*, 142 A.3d 796, 806 (Pa. 2016), for the proposition that the proponent of a lost will must prove that the will was undestroyed and unrevoked by clear and convincing evidence. In contrast, Tyler cites to *In re Estate of Brumbaugh*, 170 A.3d 541, 545 (Pa. Super. 2017) to contend that the evidence rebutting the presumption must only be "positive, clear and satisfactory," a standard he argues is less than clear and convincing evidence. We agree with Tyler, as this Court has repeatedly held that "positive, clear and satisfactory" evidence is required to establish that a will remained unrevoked by a testator. *Id.*; *see also In re Estate of Maddi*, 167 A.3d 818, 822 (Pa. Super. 2017). In *Estate of Wilner*, our Supreme Court addressed the specific burden of proof required to establish the *terms* of a lost will. Here, however, the relevant terms of Decedent's lost will are undisputed: he identified Tyler and Grace as the sole beneficiaries and named Tyler as executor, as confirmed by the records from Legal Zoom and various witnesses to the original will.

will remains undestroyed or unrevoked by a decedent and thus rebut the existent legal presumption." *Id.* "Accordingly, a court will not weigh the probability of the decedent's wishes or otherwise speculate as to the motives which may or may not have influenced the [testator] in the direction of intestacy." *In re Estate of Janosky*, 827 A.2d 512, 521 (Pa. Super. 2003) (finding that the presumption was unrebutted when proponent of will presented no evidence other than relationships of the parties to the decedent). Nevertheless,

> [t]his makes not only the testator's character, condition, acts, and declarations, but the conduct and interest of those who were around him from and after the date of the making of his will, legitimate subjects of inquiry. *Each of these lines of proof are important, in strengthening the other, and both together seem necessary to constitute full proof*.

*Gardner v. Gardner*, 35 A. 558, 558 (Pa. 1896) (emphasis added); *see also Maddi*, *supra* (relying on *Gardner* to find sufficient circumstantial evidence that will was not revoked by testator when he provided for his daughters through transfers prior to death and did not seek to revise his will to include them as beneficiaries).

Here, Christina overlooks a relevant circumstantial factor: that Decedent died in a gas explosion and fire that damaged his home. Tyler presented substantial evidence at the hearing that Decedent had for years expressed to his friends, family and acquaintances that he intended to disinherit Christina. He took the initial step to do so in November of 2018 by creating and purchasing the will, with Tyler's assistance, on Legal Zoom. He

instructed Tyler to indicate that Decedent had no children when answering the questionnaire to generate the will and he named only Tyler and Grace as beneficiaries. He reaffirmed his decision to disinherit Christina over 18 months later when he had the instrument notarized.

Multiple disinterested witnesses, including both witnesses to the will, Michael and Cousins, testified that Decedent told them on multiple occasions that he intended to disinherit Christina. Decedent was so vocal on the matter that even his co-worker and the landlord of Tyler's pizza restaurant testified that he spoke to them of disinheriting Christina. Additionally, several witnesses confirmed that Christina had not had any significant interaction with Decedent in the years leading up to his death. Christina herself admitted that she had hoped to mend fences with Decedent but was unable to do so before his death. Decedent, who chose to write his will using Legal Zoom after seeing an advertisement for the service on television, never revisited the site to rewrite or revise the will after creating the initial instrument.

All of these circumstances then culminated in the gas explosion and fire in Decedent's home that destroyed most of his personal belongings. Combined with Decedent's well-documented behavior of repeatedly discussing his plan to disinherit Christina with anyone who would listen, as well as their failure to reconcile before his death, the trial court was entitled to conclude that the will was inadvertently lost in the fire, not purposely destroyed by

Decedent with the intent to revoke it.[5] **Gardner**, **supra**; **Maddi**, **supra** (finding no evidence that will was destroyed by decedent when he had an unusual way of filing paperwork that rendered it impossible to find the original document after his death). As there was "positive, clear and satisfactory" evidence to establish that Decedent did not revoke the will prior to his death, this second issue merits no relief. **Estate of Brumbaugh**, **supra**.

Order affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/28/2023

_____

[5] We note that the trial court expressed reservations about Christina's credibility in this matter, particularly with regard to the safe. Prior to the hearing, the insurance adjuster delivered Decedent's locked safe to Christina and it was in her sole possession for two weeks before it was opened by a locksmith in the presence of the parties' attorneys. Despite a court order prohibiting her from opening the safe outside the presence of the attorneys, the trial court stated in its opinion that "[i]t is not known whether [Christina] had access to the safe between the time it was delivered to her house and opened by the locksmith." Trial Court Opinion, 11/29/22, 8 n.1.