J-A09006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ESTATE OF MAX H. MCCOMB, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: DANIEL R. ALEXANDER | No. 1087 WDA 2019 |

Appeal from the Order Entered June 18, 2019
In the Court of Common Pleas of Venango County
Orphans' Court at No(s): O.C.D. 2013-218

BEFORE:  STABILE, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY **STABILE, J.:**          **FILED: NOVEMBER 18, 2021**

Appellant, Daniel R. Alexander, appeals from the June 18, 2019 order directing the Venango County Register of Wills to revoke her order admitting to probate the 2013 Will (the "2013 Will) of Max H. McComb (the "Decedent"). Also before us is Appellant's application either to substitute Marcia Alexander, his surviving wife ("Marcia"), as Appellant or to proceed without substitution. We affirm the Orphans' Court's order and grant the application to proceed without substitution.

Appellant, formerly known as Lance McComb, is the only surviving biological child of Decedent.  Appellant was the sole heir under the 2013 Will, executed on January 15, 2013 and probated on September 19, 2013.  On

_____

[*] Retired Senior Judge assigned to the Superior Court.

December 10, 2013, Malcolm Potter ("Malcolm") and Pamela O'Neal ("Pamela," or collectively with Malcolm, "Petitioners"), Decedent's stepchildren by his second wife, Hazel Potter ("Hazel"), petitioned the Orphans' Court to set aside the 2013 Will as a product of Appellant's undue influence. Malcolm and Pamela each stood to inherit one-third of Decedent's estate, with the other third going to Appellant, under a will Decedent executed in 2011 (the "2011 Will"). The 2011 Will replaced an earlier one, executed in 2009 (the "2009 Will"), under which Appellant was the sole heir.

The Orphans' Court heard testimony on May 25, 2014, September 19 through September 22, 2017, and December 4, 6, and 7, 2017. The parties then introduced their proposed findings of fact and conclusions of law. The Orphans' Court adopted Petitioners' 288-paragraph proposed findings of fact and 37 conclusions of law verbatim and entered the order before us. This timely appeal followed.

In 2009, at the time of execution of the 2009 Will, Decedent was 84 years old, and Hazel was 88 years old. Hazel suffered from severe dementia, and the couple employed full-time, live-in aides to assist in her care at the couple's home in Valhalla, New York (the "Valhalla Home"). Decedent and Hazel lived at the Valhalla home during most of their 38-year marriage (they were married in 1973), and Hazel and her first husband raised Petitioners there. Hazel had been widowed for approximately 12 years prior to her marriage to Decedent. Decedent also owned a house and 131-acre farm in

Rouseville, Venango County, Pennsylvania (known as and referred to hereinafter as the "Hood Farm"), where Decedent and his first wife raised Appellant and another son who predeceased Appellant.

Decedent became sick and was hospitalized in August of 2011. Unable to reach Appellant in California, Decedent appointed Pamela as his healthcare proxy in place of Appellant. N.T., 9/19/17, at 28-29. Decedent suffered an ischemic stroke, meaning the blood flow to his brain was inhibited but there was no bleeding. Deposition of Andrew Lowe, M.D., 9/24/15, at 11.[1] Decedent's speech returned to normal thereafter, but he suffered some cognitive deficits. *Id.* Dr. Lowe, an internist, had been Decedent's treating doctor for many years, and Decedent's personality seemed intact to Dr. Lowe afterwards. *Id.* at 13.

In September 2011, upon his return home from the hospital, Decedent noticed unexplained transfers of money out of his Wells Fargo bank account. N.T., 9/19/17, at 27, 30-31. The money went to Appellant, who had recently asked Decedent for his account information in connection with a loan application. *Id.* at 34; Deposition of Giovanni Grande, 9/21/15, at 42, 56,

_____

[1] The parties introduced numerous depositions into evidence throughout the proceedings in this matter. No evidentiary objections lodged during the depositions or the various hearings in this matter have been argued on appeal.

62, 64.[2]  The money was transferred to Appellant through an online transfer; Decedent did his banking in person and never used online banking.  *Id.* at 11. Wells Fargo returned the funds to Decedent's account less what Appellant had spent.  *Id.* at 11, 16.  Initially, Decedent was furious about the transfers. Deposition of Anne Penachio, 9/21/15, at 20.[3]  Decedent filed an affidavit of fraud with Wells Fargo, but eventually decided he did not wish to press charges against Appellant.  N.T., 9/19/17, at 70.  Grande Deposition, 9/21/15, at 12.

In any event, Decedent's initial anger at Appellant prompted him to execute the 2011 Will.  In it, after providing for the care of Hazel if she survived him, Decedent left the Valhalla Home to Petitioners, the Hood Farm to Appellant, and the residue to Appellant, Malcolm, and Pamela in three equal shares.  Deposition of Robin Freimann, 9/21/15, at 9-10, 18, and Exhibit 7.

In early 2012, a group of Decedent's former neighbors negotiated an oil and gas lease for shale gas underneath the Hood Farm and neighboring properties.  N.T., 9/19/17, at 97-98, 108, 115.  The resulting payout to Decedent was $433,000.00.  *Id.* at 114.  The oil and gas company representative, Bryant McCrary, as well as Larry Waitz, the person who negotiated on behalf of the landowner group, both testified that Appellant

---

[2]  Grande is a private banker at Wells Fargo in Thornwood, New York, who helped Decedent when he visited the Thornwood branch.  *Id.* at 4-5.

[3] As discussed herein, Anne Penachio was a New York court-appointed evaluator.

played no role in negotiating the lease. *Id.* at 110; Deposition of Bryant McCrary, 5/13/16, at 9-11, 14, 30. Appellant claimed he was heavily involved and procured much more money for Decedent than Decedent would have received without Appellant's efforts. N.T., 9/19/17, at 114-15; Deposition of Anne Penachio, 9/21/15, at 23-24. In June 2012, shortly after Decedent received his check, Appellant traveled from his home in California to Decedent's Valhalla home "to celebrate his father's good fortune." Appellant's Brief at 6. This was Appellant's first time visiting Decedent in many years. *Id.* at 39, 46; N.T., 9/22/17, at 41.

According to Malcolm, Decedent was upset by Appellant's visit and told Malcolm he was sleeping with his keys, wallet, and checkbook under his pillow. N.T., 9/22/17, at 43. Likewise, Howard Gierling, Decedent's financial advisor since 1991, testified that Decedent told him he was sleeping with his checkbook under his pillow. N.T., 9/19/17, at 121-22, 137. Decedent told Malcolm he wanted Appellant to leave. N.T., 9/22/17, at 43. Malcolm claims he traveled to the Valhalla home at Decedent's request and, in the presence of Decedent and Appellant, asked Decedent if he wanted Appellant to leave. *Id.* at 44-45. Decedent said he wanted Appellant out by the following Wednesday, and Appellant replied, "I'm not leaving here until my business is done." *Id.* at 45. Malcolm was unable to speak with Decedent outside of Appellant's presence during his visit to the Valhalla Home. *Id.* at 44. After his return home, Malcolm's phone calls to the Valhalla home either went

unanswered, or Appellant answered and told Malcolm Decedent did not want to talk. N.T., 9/22/17, at 54.

Appellant did not leave the Valhalla home despite Decedent's request in Malcolm's presence, and Pamela testified that Decedent eventually overcame his initial upset at Appellant's presence. N.T., 9/19/17, at 73. In Grande's observations, Decedent was happy to have Appellant back in his life. Grande Deposition, 9/21/15, at 37. He described Decedent as a "real nice guy" and a "funny guy" who cracked jokes with the employees. *Id.* at 31-33, 60. He thought Petitioners and Decedent's health care aide were more concerned about Appellant's activity than Decedent was. *Id.* at 49-50.

Concerning the aides Decedent employed before Appellant's arrival, Gierling testified that Decedent was pleased with the in-home caregivers, but he eventually replaced them with another service at Appellant's behest. N.T., 9/22/17, at 137. Dr. Lowe confirmed that Decedent never complained about his home care aides; they seemed to be good people. Lowe Deposition, 9/24/15, at 18, 80. The cost was shockingly high, however, and Dr. Lowe agreed with Decedent's complaints about it. *Id.* at 51-52. The replacements Appellant hired were far less expensive but did not provide transportation for Decedent.

Gierling and Jack Bankson, a close friend of Decedent since elementary school, testified that Decedent's' behavior changed after Appellant's arrival at the Valhalla Home. N.T., 9/19/17, at 142; Deposition of Jack Bankson

Deposition, 1/22/16 at 7, 69. Gierling noted that during phone calls Decedent sounded as if he were reading word for word. N.T., 9/19/17, at 142. Gierling believed Appellant was in the room with Decedent during phone calls, directing Decedent's responses. *Id.* at 155-56. Aides at the Valhalla Home expressed concern with Appellant's presence and reported to Malcolm that they found "scripts" near the telephones apparently written to guide Decedent's telephone conversations. N.T., 9/19/17, at 50-52, 142, Petitioners' Exhibit C.

According to Bankson, Appellant and Decedent had not seen each other for years, despite Decedent putting Appellant through various institutions of higher learning until Appellant was thirty-five years old. *Id.* at 37-38, 43. Decedent expressed to Bankson that he mistrusted Appellant's motives for visiting. Bankson Deposition, 1/22/16, at 43-44. He believed Appellant wanted Decedent's estate, and that he was failing to provide proper care after the move to Pennsylvania. *Id.* at 77-78. Appellant mostly refused to admit Decedent's Pennsylvania neighbors for visits; he informed none of the Pennsylvania neighbors when Hazel passed away; and there was no obituary for Hazel in a local newspaper. *Id.* at 83, 99, 103-04. Appellant let Bankson in the Valhalla Home but was controlling of the conversations and frequently interrupted. *Id.* at 89-90.

John Pierce, who grew up next door to the Valhalla Home, had lived there for nearly thirty consecutive years prior to Decedent's death, had always been friendly with Decedent and Hazel, and noticed that they did not interact

with him or other neighbors after Appellant moved in. *Id.* at 55; Pierce Deposition, 9/21/15, at 4, 11. Pierce stored the personal effects of a home care aide who was fired suddenly upon Appellant's arrival. *Id.* at 11, 17. He had never previously heard Decedent complain about the aide. *Id.* at 18. Pierce heard Decedent speak highly of Petitioners, Pierce knew Decedent was hurt that Appellant rarely called or visited and did not attend the wedding of Decedent and Hazel. *Id.* at 12-13. Pierce described Decedent as strong willed when he had to be. *Id.* at 28. Pierce believed Appellant's only reason for moving into the Valhalla Home was to inherit it. *Id.* at 38-39.

Evidence suggests that Decedent's view of Petitioners changed after Appellant's arrival. Officer Peter Blume of the Mount Pleasant, New York, Police Department, read from an incident report (he was summoned to the Valhalla Home in response to concerns over Hazel's well-being), which stated, "[Decedent] did express concern to this officer as to the intentions of Hazel's children, even referring to them as thieves, although patrol believes those may be words that [Appellant] influenced [Decedent] to say and believe over the course of his months' plus visit." Blume Deposition, 11/3/15, at 17. Blume said the home healthcare worker overheard conversations in which Appellant spoke ill of Petitioners to Decedent. *Id.* at 18. The healthcare worker heard Appellant refer to Petitioners as "thieves" and "gold diggers," words Decedent later used to describe Petitioners to Blume. *Id.* at 49-50. The healthcare worker Blume spoke to believed Appellant and Petitioners were

more concerned about Decedent's and Hazel's assets than their health. *Id.* at 40-41. Blume believed the healthcare worker was genuinely concerned for Decedent and Hazel but discerning those concerns and expressing them to police was beyond the scope of her employment. *Id.* at 42. Blume noted that Decedent did not seem to feel uncomfortable or threatened by Appellant's presence. *Id.* at 47-48. Blume believed, nevertheless, that Appellant wanted to be the dominant factor in how the estate was distributed, and that Decedent was receiving "one-sided information" from Appellant. *Id.* at 44, 47.

Notes from Decedent's visit to Dr. Lowe on June 1, 2012 indicate "mild to moderate cognitive loss," meaning "he's still functioning pretty well." Lowe Deposition, 9/24/15, at 19-20. On July 3, 2012, Decedent presented with confusion; one of the home care aides reported that Decedent was stressed about some transfers of money. *Id.* at 21. Notes from various 2012 visits indicate that Decedent could converse normally but that his short-term memory was impaired. *Id.* at 22-23. Decedent knew the current date but did not know or recognize the name of the President. *Id.* at 26. Decedent understood the things he was saying to Dr. Lowe, and he was clear. *Id.* at 35.

Dr. Lowe noted that Appellant put Decedent on numerous supplements, including fish oil, vitamin D, multivitamins, linoleic acid, beta carotene, papaya enzyme, cherry amino acid, vitamin C, Chlorenergy pills, folic acid, and niacin. *Id.* at 26. Dr. Lowe recommended cessation of all but the fish oil, vitamin D,

and multivitamin. *Id.* Also, Appellant was feeding Decedent raw eggs. Dr. Lowe "strongly advised the risk of food poisoning from eating a raw egg." *Id.* at 27. These notes come from an August 6, 2012 visit at which Decedent presented with, among other things, diarrhea. *Id.* at 25. The notes indicate that the issue had resolved. Appellant apparently reported that the raw egg diet began afterward and contributed to Decedent's recovery. *Id.* at 25. Dr. Lowe disapproved but discerned no ill intent in Appellant's decision to provide the supplements and raw eggs. *Id.* at 63.

Dr. Lowe advised assistance with issues regarding Decedent's estate and noted that someone with moderate dementia "can be taken advantage of" and "very easy to prey upon." *Id.* at 45. Dr. Lowe wrote a letter to Decedent memorializing Decedent's clearly expressed wish that his finances be available for the long-term care of Hazel, and that the Hood Farm be willed to Appellant. *Id.* at 46.

Petitioners' concerns over Appellant's treatment of Decedent led them to file for the appointment of a guardian for Decedent in New York on July 10, 2012. The guardianship petition stated that Decedent suffered from memory loss and confusion, and that Hazel, then age 91, suffered from advanced Alzheimer's. Decedent appeared at the initial proceeding and did not oppose appointment of a guardian. The New York Court appointed a temporary guardian and issued a preliminary order precluding Appellant from moving

Decedent across state lines. The court also forbade encumbrance of Decedent's property by Petitioners or Appellant.

Anne Penachio, the New York court-appointed evaluator, confirmed the health aide's attachment to Decedent and concern about Appellant's negative impact on him. Deposition of Anne Penachio, 9/21/15, at 33. Penachio interviewed Appellant[4] and noted his apparent "controlling influence" over Decedent, and his resentment toward Petitioners based on his belief that his inheritance was paying for their mother's health care. *Id.* at 36-37. Appellant became "enraged" at the prospect of Penachio recommending appointment of a guardian and told Decedent Penachio wanted to take away his freedom. *Id.* at 37.

According to Penachio, Decedent wanted the Hood Farm to go to Appellant, the Valhalla Home to go to Petitioners, and the remainder of the estate to be split equally among the three. *Id.* at 59. Decedent expressed frustration with Petitioners not providing for the care of Hazel. *Id.* at 60. He also was upset by the guardianship proceeding. *Id.* at 65. When Penachio explained that she was concerned about him being preyed upon, he responded that he "had the same concerns." *Id.* at 68. Decedent ultimately consented to the appointment of a guardian. *Id.* Decedent told Penachio that the caregiver he had before Appellant moved in was "excitable and caused

_____

[4] Appellant did not testify at any of the Pennsylvania hearings.

- 11 -

commotion." *Id.* at 75. Decedent also said she was too expensive. *Id.* at 76-77.

Pauline Galvin, the New York court-appointed temporary guardian of Decedent's person and property, testified that the creation of a guardianship did not affect Decedent's testamentary capacity. Galvin Deposition, 9/21/15, at 5, 40. She believed that Decedent was able to articulate his wishes, and that he did not want a guardianship. *Id.* at 56. Galvin testified that Decedent signed a $180,000 mortgage for the Valhalla Home despite an order to the contrary. *Id.* at 10-11, 13-15. Upon the filing of her final report, Galvin notified Decedent's long-time financial advisor Gierling that checks needed to be issued to the guardian and court examiner; Gierling responded that Decedent's accounts—formerly worth hundreds of thousands of dollars—had been emptied. *Id.* at 23, 38. Galvin considered this a violation of her authority, and the guardianship court issued an order for the return of funds to a guardianship account. *Id.* at 23-25. As of Decedent's move to Pennsylvania, Galvin was no longer guardian of his person because the court determined that he did not need a personal guardian. *Id.* at 31. At a February 19, 2013 hearing at which Decedent and Appellant both appeared, the New York court did not issue any contempt order. The court announced its intention to terminate the guardianship, and it issued an order in accord with that intent on April 3, 2013. During the guardianship proceeding, Decedent

filed an affidavit stating that he authorized Appellant's 2011 transfers from his Wells Fargo account. Grande Deposition, 9/21/15, at 52-53. (*See* n. 2).

In October 2012, while the guardianship proceedings were pending against Decedent and Hazel[5] in New York, Appellant moved them to the Hood Farm. There is no evidence Appellant secured any help in caring for Decedent and Hazel at the Hood Farm. Dr. Lowe was not consulted about the move to Pennsylvania. Lowe Deposition, 9/24/15, at 48. Hazel would have needed a home health aide in Pennsylvania; Decedent just needed to continue his medicine and periodic blood testing. *Id.* at 50.

Petitioners were not informed of this move in advance, and they were not permitted to visit Decedent or Hazel in Rouseville. N.T., 9/9/17, at 55-56. In connection with her investigation for a guardianship proceeding concerning Hazel, Penachio reported that she contacted local police upon learning that Hazel would be removed from New York despite a court order prohibiting it. Penachio Deposition, 9/21/15, at 52-54, 89. Local police responded to the Valhalla Home on October 21, 2012, based on a report of a moving van in the driveway. At the scene, Sergeant Michael McGuinn of the Mount Pleasant Police Department observed Appellant overseeing the loading of the van. McGuinn Deposition, 9/23/15, at 16. Appellant told McGuinn he was moving Decedent and Hazel to Pennsylvania that day. *Id.* A health care

_____

[5] Petitioners commenced a separate guardianship proceeding for Hazel.

aide named Lily told McGuinn that Appellant told her not to call the police. *Id.* She played a recording of that conversation for McGuinn. *Id.* at 17. Appellant had informed Lily on the day of the move that her services were no longer required because Decedent and Hazel were moving. *Id.* at 17, 42.

McGuinn described Hazel as "very frail," and "an empty vessel." *Id.* at 23. Concerned by her appearance when he saw her on October 21, 2012, McGuinn summoned a paramedic. The paramedic suggested taking Hazel to a local medical center, but Decedent refused to permit it. *Id.* at 17. Decedent was adamant about not taking Hazel to the hospital, and about moving to Pennsylvania. *Id.* at 40. According to McGuinn, a longtime acquaintance of Decedent, it was "out of character for Decedent to be so forceful." *Id.* McGuinn read to Decedent and Appellant a New York state court order prohibiting Hazel's transportation out of the state. *Id.* at 18-19. In response, Appellant (or Decedent—it is unclear from the transcript) "gave every indication that he didn't care about the court order." *Id.* at 20. Hazel passed away shortly after the move. Pamela was unaware of her mother's passing until three weeks after it occurred. N.T., 9/9/17, at 60.

On January 15, 2013, Appellant took Decedent to the office of Jeffrey Banner to have the 2013 Will prepared. The 2013 Will left Decedent's entire estate to Appellant. Banner testified that Decedent appeared competent and was able to articulate his wishes. N.T., 9/21/17, at 9. Banner expected any new will to be contested, so he wanted to document that the 2013 Will was

- 14 -

executed at Decedent's direction. *Id.* at 4. Banner described Decedent as "one pissed off marine […] a very well-educated man, very accomplished, and he knew exactly what he wanted to do." *Id.* at 7. Banner further described Decedent as "[o]ne of the most competent 88-year-old marines I probably ever sat with." *Id.* at 45. Decedent had a "command presence" when he entered a room. *Id.* at 45. In his conversations with Decedent, Banner found Decedent to be very dominant over Appellant. *Id.* Banner described Appellant as "extremely intelligent, yet socially awkward or inept and quiet in the presence of Max." *Id.* at 9. Banner believed Decedent was "running the show." *Id.*

Banner testified that Decedent wanted out of New York, and that he was angered by the guardianship proceeding. *Id.* at 7-8. Banner believed Decedent traveled from New York to Pennsylvania to get away from intrusion from family and intrusion from lawyers appointed pursuant to the guardianship. *Id.* at 34. According to Banner, Decedent believed Gierling was "slippery" and that Petitioners were "bastard crooks" who ripped up the 2009 Will while he was sick and procured the execution of the 2011 Will. *Id.* at 34-35, 39-40.

As to the details of the New York guardianship, Banner testified that he did not have a complete record. *Id.* at 17. At one point, when asked if he was aware of the pending guardianship in New York, Banner responded, "Potentially, yes." *Id.* at 36. He claimed ne never saw a New York order

prohibiting Decedent from executing a new power of attorney, which Decedent did in Banner's office along with the 2013 Will. *Id.* at 23. An intake form from Banner's office indicated that Appellant was Decedent's financial advisor, and that Appellant was a professional financial advisor. *Id.* at 26-27. The intake form also indicated that Decedent and his spouse were in good health. *Id.* at 31. All phone calls from Decedent to Banner were on Appellant's cell phone, as Decedent did not have his own phone. *Id.* at 29-30. Appellant also transported Decedent to each of his visits to Banner's office. *Id.* at 30.

Before turning to the merits, we address two preliminary concerns. First, Appellant was critically injured in an automobile accident in California in December of 2017. His injuries confined him to a nursing home where he died on August 22, 2020. On July 9, 2021, Appellant's counsel filed a document titled "Application for Substitution or Non-Substitution of Appellant." The application requests this Court to either substitute Appellant's surviving wife, Marcia, as Appellant, or to decide the issues on appeal without substitution for Appellant. The application avers that Marcia has elected not to open an estate for Appellant. Application, 7/9/2021, at ¶¶ 3-5. The only item in Appellant's estate would be his inheritance from Decedent, and the Application avers that opening an estate in California and an ancillary estate in Pennsylvania might not be worth the cost to Marcia, depending upon the outcome of this appeal. *Id.*

Rule 502 of the Pennsylvania Rules of Appellate Procedure provides, in pertinent part:

> **(a) Death of a party.**--If a party dies after a notice of appeal or petition for review is filed or while a matter is otherwise pending in an appellate court, the personal representative of the deceased party may be substituted as a party on application filed by the representative or by any party with the prothonotary of the appellate court. The application of a party shall be served upon the representative in accordance with the provisions of Pa.R.A.P. 123. If the deceased party has no representative, any party may suggest the death on the record and proceedings shall then be had as the appellate court may direct.

Pa.R.A.P. 502(a). Marcia has not been appointed Appellant's personal representative and does not intend to open an estate for him. Appellant therefore relies on the final sentence above, providing that the appeal may proceed as this Court may direct upon filing of a suggestion of death.

Appellant asserts no grounds on which we may order the substitution of Marcia. He does not argue that she has standing to be substituted as a party in her own right. Instead, he cites **Witherspoon v. McDowell-Wright**, 241 A.3d 1182 (Pa. Super. 2020), a conversion action between an estranged romantic couple. The appellant in that case appealed from a $7,500.00 judgment in his favor, and the appellee died after the appeal was filed. This Court explained that the "Rules of Appellate Procedure allow for, but do not mandate, substitution under these circumstances." **Id.** at 1186 (citing Pa.R.A.P. 502(a)). The **Witherspoon** Court noted the distinction between Rule 502(a) and the trial court rule, which mandates substitution of a personal representative, and which has been construed to deprive the trial court of

- 17 -

subject matter jurisdiction absent the appointment of a personal representative. *Id.* (citing Pa.R.C.P. No. 2355; *Grimm v. Grimm*, 149 A.3d 77, 84 (Pa. Super. 2016), *appeal denied*, 169 A.3d 25 (Pa. 2017)). Because Rule 502(a) is permissive, the *Witherspoon* Court held, the lack of substitution does not deprive this Court of jurisdiction. *Id.* Further, the appeal was not moot because its outcome had ramifications for the appellant's rights against his former girlfriend's estate. *Id.* (citing *Shiomos v. Commonwealth State Emp. Ret. Bd.*, 626 A.2d 158, 159 n.1. (Pa. 1993) (holding that an appellant's death does not render an appeal moot where the outcome may have relevance to the appellant's estate or to issues recurring statewide)).

Pursuant to *Witherspoon* and *Shiomos*, we conclude that Appellant's death does not deprive this Court of subject matter jurisdiction. We further conclude that this appeal is not moot, as it affects Petitioners' right, if any, to recover under the 2011 Will. The outcome will also affect the amount of Appellant's inheritance from Decedent, which will in turn pass from Appellant's estate to any person or entity entitled to recover under any applicable law or testamentary document. We therefore accept the application in lieu of a separately filed suggestion of death and grant Appellant's application to proceed without substitution of a party.[6]

---

[6] For simplicity's sake, we shall continue to refer to the deceased Appellant as "Appellant" herein.

Next, we address Appellant's challenge to the Orphans' Court's decision to adopt, verbatim, Petitioners' proposed findings of fact and conclusions of law. Our Supreme Court discourages this practice:

> We caution the PCRA court on remand against over-reliance upon any party's submissions as the basis for explaining its rulings. We generally discourage the practice of wholesale adoption of facts or law as presented by litigants. **Commonwealth v. Williams**, [732 A.2d 1167, 1176 (Pa. 1999)] (admonishing PCRA court against wholesale adoption of one advocate's position at a critical stage of the proceedings; calling for autonomous judicial expression of reasons for decision); **Id.** at 1192 (opining that appellate review should not proceed until PCRA court files a proper opinion) (Castille, J., concurring). Moreover, a fact-finding court should support its determinations with sufficient explanations of the facts and law, including specific citations to the record for all evidence on which it relies, and to the legal authority on which it relies, to facilitate appellate review. **Cf. Commonwealth v. Norris**, [389 A.2d 668 (Pa. Super. 1978)].

**Commonwealth v. Weiss**, 986 A.2d 808, 816 n. 4. (Pa. 2009). We echo the Supreme Court's admonition here. The Orphans' Court's opinion offers little in the way of its own analysis—a two-page summary on the concluding two pages of a 72-page opinion that otherwise adopts the Appellee's proposals.

Nonetheless, this Court has held that a trial court's adoption of a party's proposed findings does not create reversible error:

> Appellants next contend that the trial court erred by relying excessively on the Bank's proposed findings and adopting many of its findings of fact from the Bank's proposed findings. Appellants cite no case law to support this proposition as indeed there is none. Rather, the cases hold that it is **not** error for the trial court to adopt a party's proposed findings of fact and/or conclusions of law. In **Sotak v. Nitschke**, [449 A.2d 729 (Pa. Super. 1982)], the court adopted all but one of the plaintiff's proposed findings of fact and conclusions of law. On appeal, we

held that the court may adopt a party's proposed findings and conclusions as it deems warranted or it may state its findings and conclusions in its own language. Similarly in ***Commonwealth ex rel. Bloomsburg State College v. Porter,*** [610 A.2d 516 (Pa. Cmwlth. 1992)], the court adopted the plaintiff's findings of fact and conclusions of law. The Commonwealth Court held that this was not reversible error, citing the statement in ***Sotak*** that 'Nothing in the rules, however, precludes a court from adopting those findings and conclusions proposed by a party. In fact, the contrary is implied.' ***Bloomsburg State College***, 610 A.2d at 518 (citing ***Sotak,*** [449 A.2d 733]). There is no merit to this claim.

***Eighth North-Val, Inc. v. William L. Parkinson, D.D.S., P.C., Pension Tr.***, 773 A.2d 1248, 1251–52 (Pa. Super. 2001) (emphasis in original).

Along with our Supreme Court in ***Weiss***, we disapprove of the Orphans' Court's wholesale adoption of Appellee's proposed findings of fact and conclusions of law. To facilitate appellate review, the Orphans' Court should have provided its own summary of facts and legal analysis of a voluminous record compiled over many years. In accord with this Court's opinion in ***Eighth North***, however, we decline to find reversible error. Petitioners' proposed findings of fact were copiously supported with record citations, and our review of the record largely confirms their accuracy.

We now turn to the central issue in this case: does the record support the Orphans' Court's conclusion that Petitioners established, by clear and convincing evidence, that Appellant exerted undue influence over Decedent, and that Appellant failed to rebut that finding by clear and convincing evidence.

In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*In re Estate of Nalaschi*, 90 A.3d 8, 11 (Pa. Super. 2014). "In making a will, an individual may leave his or her property to any person or charity, or for any lawful purpose he or she wishes, unless he or she "lacked mental capacity, or the will was obtained by forgery or fraud or undue influence, or was the product of a so-called insane delusion." *Id.* Where the proponent of the will presents evidence of the formalities of probate (not at issue presently), the burden shifts to the person contesting on grounds of undue influence who must prove, by clear and convincing evidence, that:

(1) the testator suffered from a weakened intellect at the time the will was executed; (2) there was a person in a confidential relationship with the testator; and (3) the person in the confidential relationship received a substantial benefit under the challenged will.

*Id.* at 14. "[U]ndue influence is a subtle, intangible and illusive thing, generally accomplished by a gradual, progressive inculcation of a receptive mind. Consequently, its manifestation may not appear until long after the weakened intellect has been played upon." *In re Estate of Fritts*, 906 A.2d 601, 607 (Pa. Super. 2006), *appeal denied*, 916 A.2d 1103 (Pa. 2007). "Conduct constituting influence must consist of imprisonment of the body or

mind, fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will." ***In re Estate of Angle***, 777 A.2d 114, 123 (Pa. Super. 2001) (citations and quotation marks omitted). Where the contestant establishes the three elements, the burden shifts to the proponent to prove, by clear and convincing evidence, the absence of undue influence. ***Nalaschi***, 90 A.3d at 14.

Here, there is no question that Appellant, the person allegedly in the confidential relationship with Decedent, received a substantial benefit under the 2013 Will. We therefore confine our analysis to whether Decedent suffered from a weakened intellect and whether Appellant and Decedent were in a confidential relationship. "Weakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution." ***Id.*** (quoting ***In re Bosley***, 26 A.3d 1104, 1112 (Pa. Super. 2011)). There is no bright line test for weakened intellect, but our courts "have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." ***Fritts***, 906 A.2d at 607. In discerning persistent confusion, "a trial court has greater latitude to consider medical testimony describing a decedent's condition at a time remote from the date that the contested will was executed." ***Id.***

Dr. Lowe testified that, as of mid-2012, Decedent was moderately cognitively impaired. He also testified that Decedent's impairment rendered him susceptible to be preyed upon financially. Dr. Lowe also noted persistent problems with Decedent's short-term memory. For these reasons, Dr. Lowe asked Decedent about his wishes for his estate and memorialized those wishes in a letter to Decedent. At that time, Decedent wanted the Valhalla Home to go to Petitioners and the Hood Farm to Appellant, as per the 2011 Will. Dr. Lowe's observations, made within approximately a half year of the execution of the disputed 2013 Will, are pertinent to the weakened intellect analysis as per **Fritts**.

Decedent's Valhalla neighbor Pierce and Decedent's lifelong friend Bankson, both of whom knew Decedent for much of his life, testified to distinct changes in Decedent's behavior after Appellant arrived. They noticed Appellant isolating Decedent and controlling and/or interrupting Decedent's conversations. Other changes accompanied Appellant's arrival, after many years of absence, in Decedent's life. Decedent went from being furious at Appellant's unauthorized removal of money from Decedent's Wells Fargo account, to filing an affidavit in the New York guardianship proceeding averring that he authorized the transfers. Decedent went from speaking highly of Petitioners, according to next-door neighbor Pierce, to calling them bastard crooks and gold diggers. Decedent also changed health care aide services, though it appears there were legitimate financial reasons for doing so. The

changes Appellant made to Decedent's diet—numerous supplements and raw eggs—were bizarre, though they apparently did no lasting harm. Finally, the record reflects that Decedent had always taken good care of Hazel, on his own at first and then with in-home aides when he was no longer able. But on the day of the move to Pennsylvania, he ignored a court order prohibiting her removal from New York, and he ignored the suggestion of Sergeant McGuinn and a paramedic that Hazel be transported to a nearby hospital for observation. Sergeant McGuinn, a longtime acquaintance of Decedent, noted that Decedent's forceful behavior on that occasion was out of character for him.

Regarding Appellant, the record shows he rarely visited or contacted Decedent prior to the oil and gas windfall. Appellant told Hazel's son Malcolm that he was not leaving Valhalla until his job was done. Appellant repeatedly told Penachio that Petitioners were spending his inheritance caring for Hazel. He told Bankson he was a financial advisor. He told gas company representative McCrary he was a petroleum engineer. He claimed to play a leading role in procuring $433,000.00 in oil and gas royalties for Decedent, despite testimony to the contrary from McCrary and from Waitz, who negotiated the lease on behalf of the landowners. As the Orphans' Court noted in its opinion, Appellant failed to appear to testify in this matter, and failed to file an accounting for his time as executor of Decedent's estate, resulting in

the issuance of a bench warrant and sanctions. Orphans' Court Opinion, 7/18/19, at 72.

After the move, Appellant accompanied Decedent to the law offices of Banner for the execution of the 2013 Will. Banner was very forceful in his testimony about Decedent's apparent domination of Appellant. But his testimony about Decedent's personality does not square with others who knew Decedent for much of his life, including Pierce and Sergeant McGuinn. Grande, who was acquainted with Decedent only from Decedent's occasional visits to the bank, described him as friendly and a bit of a jokester. Banner's credibility—and/or the weight to be given his observation as compared to others who knew Decedent longer—was for the Orphans' Court to decide.

In summary, there was evidence that Decedent's dementia had progressed to the point where he was susceptible to manipulation. There is testimony from non-party longtime acquaintances of Decedent that his behavior changed upon Appellant's arrival. Further, the record contains evidence of Appellant's controlling behavior and dishonesty, and the opportunistic timing of his arrival in Valhalla. All these things support a finding that Decedent suffered from weakened intellect, and that Appellant worked gradually to prejudice Decedent's mind against Petitioners and leave his estate to Appellant.

Next, we consider whether Appellant and Decedent had a confidential relationship. "[A] confidential relationship exists when the circumstances

make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed." **Nalaschi**, 90 A.3d at 15 (quoting **In re Estate of Boardman**, 80 A.3d 820, 823 (Pa. Super. 2013)). A confidential relationship "is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power." **Fritts**, 906 A.2d at 608. "A parent-child relationship does not establish the existence of a confidential relationship nor does the fact that the proponent has a power of attorney where the decedent wanted the proponent to act as attorney-in-fact." **Angle**, 777 A.2d at 123.

The record supports a finding by clear and convincing evidence that Appellant gradually gained trust and exerted an overmastering influence over Decedent. Appellant controlled whether and when Decedent visited with neighbors, friends, and even his stepchildren. Appellant controlled the topics of conversation, and, to some extent, what Decedent said during those visits. Decedent hired new healthcare aides at Appellant's behest. Appellant exerted some control over Decedent's diet, accompanied Decedent to doctor's visits, moved Decedent and Hazel to Pennsylvania, and transported Decedent to Banner's office for his consultations regarding the 2013 Will. Decedent's position of complete trust toward Appellant, and the potential for Appellant's abuse of power, is plainly evident. For all the foregoing reasons, we conclude

the record supports the Orphans' Court's findings, by clear and convincing evidence, that Appellant exercised undue influence over Decedent.

Furthermore, we cannot conclude that Appellant rebutted the finding of undue influence. The record contains nothing to rebut Dr. Lowe's testimony that Decedent's mental state had declined to the point that he could be easily preyed upon, despite his alertness and ability to express his wishes. Moreover, the Orphans' Court clearly credited the testimony about the control Appellant exerted over Decedent, and the changes in Decedent's thinking that followed. The court clearly disbelieved or assigned little weight to Banner's testimony given the events that preceded Decedent's visits to his office.

We recognize Appellant's concern about the Orphans' Court's reliance on Petitioners' proposed findings of fact. Again, we strongly disapprove of the Orphans' Court's wholesale adoption thereof. We further agree with Appellant's assertion that in some instances the findings are slanted in Petitioners' favor, as could be expected. We are cognizant that the New York court ultimately concluded that Decedent did not need a guardian, that there was no legal impediment to Decedent leaving New York, and that various witnesses, including Dr. Lowe, Penachio, Banner, and others, testified that Decedent was alert and could express his wishes. But given Dr. Lowe's testimony that Decedent was susceptible to being preyed upon and given the many changes in Decedent's behavior, lifestyle, and interactions that coincided with Appellant's arrival in Valhalla, culminating in Decedent's

execution of the 2013 Will, the Orphans' Court was presented with a judgment call as to whether the 2013 Will was the product of Appellant's undue influence over Decedent. We discern no reversible error under the applicable standard of review.

Order affirmed. Application for non-substitution granted. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/18/2021