J-A15033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ESTATE OF: JAMES D. LAUBACH | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ABBY J. LAUBACH AND LUKE M. LAUBACH | : : : : : : | No. 1563 MDA 2024 |

Appeal from the Order Entered October 11, 2024
In the Court of Common Pleas of Clinton County Civil Division at No(s):
2022-00185

BEFORE:   BOWES, J., STABILE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED: AUGUST 26, 2025**

Abby J. Laubach and Luke M. Laubach (Petitioners/Appellants) appeal from the order entered in the Court of Common Pleas of Clinton County denying their petition to set aside the Last Will and Testament of their father, James D. Laubach ("Decedent"), as the product of undue influence.  We affirm.

The present controversy over the Last Will and Testament of Decedent James Laubach pits his children, Petitioners/Appellants Abby and Luke Laubach, against Executor/Appellee Grace Wheeland, their paternal aunt and the sole beneficiary of Decedent's will.  The facts and procedural establish that 65-year-old Decedent died on September 26, 2022, of metastatic lung cancer. 17 days before his death, he executed his Last Will & Testament, dated September 9, 2022, in the presence of his sister, Grace Wheeland, an attorney,

_____

[*] Former Justice specially assigned to the Superior Court.

and two witnesses. On October 17, 2022, Decedent's Will was probated, and Wheeland was appointed Executor of the estate pursuant to the Will. There is no dispute that Decedent's Will bequeaths all of Decedent's property to Wheeland, leaving nothing for his children.

As Executor, Wheeland instructed Decedent's minor daughter Abby that the Will required her to vacate the family residence immediately. Abby always lived with Decedent prior to his illness and relocation to hospice, and she continued to live at the residence until Wheeland informed her that she must relocate. Wheeland advised Decedent's son, Luke, a college student at the time, that the Will permitted him to reside in the family residence only if he paid rent. Luke moved out.

On April 10, 2023, Luke and Abby filed their "Petition to Set Aside the Last Will and Testament" of their father. On May 13, 2024, the trial court conducted an evidentiary hearing at which it received testimony from Petitioners Luke and Abby and an exhibit containing the deposition testimony of Responder/Executor Wheeland. One manner by which Petitioners sought to challenge the Will was through admission of medical records from health care systems University of Pittsburgh Medical Center ("UPMC") and Geisinger, which they offered to show how both the severe pain Decedent was experiencing from his mounting cancer and the prescribed pain killers he was taking must have compromised his mental faculties and made him susceptible to the undue influence Wheeland allegedly exerted when she assisted him in executing his Will.

In the trial court's first Order and Opinion, dated May 31, 2024, it explains that at the evidentiary hearing it accepted Petitioners' proffer of Decedent's medical records into evidence, but only for the limited purpose of confirming the "facts of" Decedent's medical care received through hospitalization, medical appointments, and treatments prescribed, as it ruled this was the only purpose fitting within the Business Records Exception to the Hearsay Rule, at Pa.R.E. 803(4), *infra*. In so doing, the trial court indicated it relied on precedent prohibiting consideration of any form of medical opinion, diagnosis, or conclusion within such documents unless the physician or other health care provider who rendered them was available for Respondent/Executor Wheeland's cross-examination regarding the records' accuracy, reliability, and veracity, lest the court violate the rule against hearsay.

On October 7, 2024, the trial court entered its final Order and Opinion making the following findings of fact and conclusions of law:

<u>TRIAL COURT FINDINGS OF FACT</u>

- Executor Wheeland always was involved in Decedent's life.

- Wheeland visited him regularly, two to three times per month prior to his illness and became involved daily in all aspects of his life when he became ill.

- During his illness, Wheeland took him to the bank to address financial needs, assisted him with paying bills, and authorized medical and hospital care for Decedent.

- Wheeland also made arrangements for Decedent to prepare his Last Will and Testament now in question, which made her sole beneficiary and their brother, Steven, contingent beneficiary.

- Daughter/Petitioner Abby Laubach believed Decedent to be confused when he entered hospice, never to leave, on September 11, 2022.

- Daughter/Petitioner Abby Laubach was not present when Decedent executed his Will.

- Son/Petitioner Luke Laubach lived in Decedent's residence from birth to Decedent's passing, at which time Luke was 23 years old.

- After Decedent's death, Wheeland advised Luke, a college student, that he would need to pay rent to remain in the residence. Luke moved out.

- Luke testified he was working during the two weeks prior to his father's hospitalization and would not return home until the evenings, by which time his father was sleeping.

- Luke testified his father was nonverbal in September of 2022.

- Luke testified his father needed assistance with basic tasks like getting a drink or turning on the air conditioner.

- Luke testified his father smoked marijuana during his life but was unsure whether this continued until the time of his final illness. He believed, however, that his father began using Oxycodone prior to the execution of the Will on September 9, 2022.

- Luke testified that his father consumed 8-12 cans of beer daily, more on weekends, and smoked one to two packs of cigarettes a day in addition to using marijuana before he became bedridden.

- Luke testified Wheeland was present daily assisting his father and making sure he was okay in all manners described above.

- Luke was unaware of circumstances regarding the preparation and execution of his father's Will.

- Luke testified he was not present when his father executed the Will.

- Luke testified he still had not seen the Will at the time of his testimony.

- Luke testified his father did not ask him to make medical decisions on his behalf or to help with banking matters.

Trial Court Opinion ("TCO"), 10/7/2024, at 2-3.

On the issue of whether Decedent's Will was the product of Wheeland's undue influence over him, the trial court acknowledged authority instructing that challengers making an "undue influence" claim against the validity of a will bear the burden of proof, which shifts to the proponent to produce clear and convincing evidence to affirmatively demonstrate the absence of undue influence, only after they establish three elements:

1. the proponent of the document received a substantial benefit;

2. a confidential relationship between the testator and proponent existed; and

3. the testator had a weakened intellect.

**See In re: Est. of Byerley**, 284 A.3d 1225, 1242 (Pa. Super. 2022).

The trial court addressed each prong of the tripartite test in order. It concluded that Petitioners established the first element, that a "substantial benefit" was received by Wheeland, by offering uncontested evidence that Decedent's Will named her Executor and sole beneficiary of the estate. TCO at 6.

On the second element concerning whether a "confidential relationship" existed between Decedent and Wheeland, the trial court aptly acknowledged the contestant bears the burden of proving that "the circumstances make it

certain the parties do not deal on equal terms, but, on one side there is an overmastering influence *or*, on the other side, weakness, dependence or trust." TCO at 7 (quoting **In Re: Estate of Fritts**, 906 A.2d 601, 608 (Pa. Super. 2006) (emphasis in original)). Guided by such authority, the trial court determined that the facts before it failed to establish a "confidential relationship" between Wheeland and Decedent.

Rather, the court opined, "the relationship between Decedent and Grace Wheeland was nothing more than a caring relationship between brother and sister." TCO at 8. It continued:

> There is no evidence presented to suggest anything other than that Grace Wheeland assisted the Decedent at his request. Grace Wheeland handled all of the Decedent's banking matters, transported him to medical appointments and took responsibility for placing him in hospice during his last days. The [trial court] did not receive any credible testimony to suggest that the Decedent was being unduly influenced to any extent by Grace Wheeland. There is nothing in the record to suggest other than that the testamentary decisions came from the Decedent and no one else.
>
> The record is devoid of any evidence that Grace Wheeland "spoke for" the Decedent, that she contributed substantially to the Decedent's decision making or that she directed the attorney, or even hinted to the Decedent what the Decedent should do. To suggest that there was an over-mastering influence is contrary to the limited facts of this case.

TCO at 8.

On the third element addressing whether the testator possessed a weakened intellect at the time the will was executed, the trial court observed:

> No evidence was presented, expert or otherwise, by the Co-Petitioners to present a *prima facie* case of weakened intellect or

- 6 -

that undue influence was used in making the Will. The [trial court] is unable to make a *prima facie* finding inasmuch as no expert testimony was presented and no one who was present when the Will was executed was called as a witness. To find otherwise would be pure conjecture.

TCO at 8-9. As such, the trial court concluded:

In summary, it is clear to the [trial court] that based on the above case law and the limited testimony, that the Co-Petitioners cannot prove the elements of undue influence. Co-Petitioners have not pointed to any evidence to show that the Decedent was induced, coerced, or influenced by Grace Wheeland into executing the Last Will and Testament. Based on the Co-Petitioners' testimony concerning all of the assistance and services provided by Grace Wheeland to her brother, it is not inconceivable that the Decedent would want to give his sister his property. Accordingly, the [trial court] will enter [its order denying Petitioners' petition to set aside the last will and testament of James D. Laubach].

*Id*. This appeal followed.

Appellant Petitioners raise the following issues for this Court's consideration:

1. Whether the trial court committed an error of law in admitting medical records of the Decedent, James D. Laubach's final treatment, but failing to consider these records for the medical opinions, diagnoses, and conclusions stated therein that support a finding of Decedent's weakened intellect?

2. Whether the trial court committed an error of law or abuse of discretion in its determination that there did not exist a confidential relationship between the Decedent and his sister, Grace Wheeland, who was the sole beneficiary and executrix of his estate and that the said Decedent, James D. Laubach, did not suffer from a weakened intellect at the time he executed the subject Will in this case on September 9, 2022?

Brief of Appellants at 8-9.

- 7 -

Our standard of review of the findings of an Orphans' Court is deferential.

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion.
>
>> However, we are not constrained to give the same deference to any resulting legal conclusions.
>
> *In re Estate of Harrison*, 745 A.2d 676, 678–79 (Pa. Super. 2000), *appeal denied,* 563 Pa. 646, 758 A.2d 1200 (2000) (internal citations and quotation marks omitted). "The Orphans' Court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." *In re Estate of Luongo*, 823 A.2d 942, 951 (Pa. Super. 2003), *appeal denied,* 577 Pa. 722, 847 A.2d 1287 (2003).

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (emphasis added).

In contesting a will on the basis it was executed under undue influence, the contestant bears the burden of proof. *In re Estate of Nalaschi*, 90 A.3d 8, 14 (Pa. Super. 2014). As acknowledged by the trial court, *supra*, the contestant carries this burden only if they establish, by clear and convincing evidence, that: (1) the testator suffered from a weakened intellect at the time the will was executed; (2) there was a person in a confidential relationship with the testator; and (3) the person in the confidential relationship received a substantial benefit under the challenged will. *Id.* (citation omitted).

Once the contestant establishes these three elements, "the burden shifts back to the proponent to prove the absence of undue influence by clear

and convincing evidence." *Id.* (citation omitted). If the contestant fails to show that the testator suffered from a weakened intellect at the time that he executed the will, the burden never shifts to the proponent of the will and the will cannot be set aside as the product of undue influence. *Byerley*, 284 A.3d at 1242.

"As our Supreme Court has held, a testator may be of sufficient testamentary capacity to make a will but still may be subjected to the undue influence of another in the making of that will." *In re Mampe*, 932 A.2d 954, 959 (Pa. Super. 2007) (*citing* *Fritts*, 906 A.2d at 606-607 (other citations omitted)). A case of undue influence is proven almost exclusively through circumstantial evidence. *Mampe*, 932 A.2d at 959 (citing *Estate of Ziel*, at 541, 359 A.2d at 734).

There is no dispute that Wheeler received a substantial benefit as the sole beneficiary under Decedent's will. Addressing the remaining two elements of the undue influence tripartite inquiry, we note first that regarding evidence offered to prove a testator possessed a "weakened intellect,"

> [t]his Court has previously stated, "[w]eakened intellect in the context of a claim of undue influence need not amount to testamentary incapacity and will generally be proven through evidence more remote in time from the actual date of the will's execution." *In re Bosley*, 26 A.3d [1104,] 1112. While Pennsylvania courts "have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." [] *Fritts*, [*supra* at 607] (citations omitted). Importantly, in an undue influence case, "a trial court has greater latitude to consider medical testimony describing a decedent's condition at a time remote from the date

that the contested will was executed." *Id.* (citation omitted). We will not revisit the trial court's conclusions when they rest on legally competent and sufficient evidence. *Id.*

*Nalaschi*, 90 A.3d at 14.

Whether a "confidential relationship" will be found to have existed between the testator and the second party depends on whether the contestant carries their burden of proving that "the circumstances make it certain the parties [did] not deal on equal terms, but, on one side there [was] an overmastering influence *or*, on the other side, weakness, dependence or trust." *Fritts* at 608 (Pa. Super. 2006) (emphasis in original) (stating a confidential relationship "is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a particular abuse of power.")); *See also In Re: Estate of Angle*, 777 A.2d 114, 125 (Pa. Super. 2001); *In Re: Estate of Jakiella*, 510 A.2d 815, 817-818 (Pa. Super. 1986) (confidential relationship exists "whenever circumstances make it certain that the parties did not deal on equal terms but that on one side there was an overmastering influence, and on the other, dependence or trust, justifiably reposed.").

In Appellants' first issue, part of their argument[1] charges the trial court with error for admitting medical records containing caregiver statements

_____

[1] Appellants are entitled to no relief on their first issue to the extent they also contend the trial court erred when it "fail[ed] to consider the records for the medical opinions, diagnoses, and conclusions stated therein that supported a finding of the decedents [sic] weakened intellect[.]" *See* Brief for Appellants, Heading for "Argument #1," at p. 16. In making this argument, Appellants
*(Footnote Continued Next Page)*

- 10 -

about the facts of Decedent's physical condition during the last weeks of his life but ruling, nevertheless, that without an expert opinion to explain how such physical conditions would have affected Decedent's mental state at the time he executed his will it could not consider them in determining whether the Decedent possessed a "weakened intellect" or was subject to a "confidential relationship" with Wheeler.

Appellants sought to admit the evidence under Pa.R.E. 803, *Exceptions to the Rule Against Hearsay* and interpretive decisional law, permitting admission of out-of-court statements regarding the facts of one's physical state that were made as part of the process necessary to reach diagnosis and order treatment. This Court has recently outlined how Rule 803(4) and relevant decisional law bear on the admission of such out-of-court statements made in medical records:

Pa.R.E. 803(4) provides:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> ....

erroneously conflate the distinct concepts of (1) a caregiver's statements cataloguing the facts associated with how the patient presents to the caregiver—such as vital signs, general appearance, complaints of pain, affectation, mood, behavior—for the purpose of forming opinions and making diagnoses and (2) the ultimate statements of opinion and diagnoses derived from such facts. Our jurisprudence is clear that Section 803(4) provides an exception to the hearsay rule for the first type of statements addressing the facts of a patient's presentation but not the second type of statements offering diagnoses or opinions of what those facts ultimately mean.

- 11 -

**(4) Statement Made for Medical Diagnosis or Treatment.** A statement that:

    (A)    is made for—and is reasonably pertinent to—medical treatment or diagnosis in contemplation of treatment; and

    (B)    describes medical history, past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof, insofar as reasonably pertinent to treatment, or diagnosis in contemplation of treatment.

Pa.R.E. 803(4).

Citing Pa.R.E. 803(4), this Court has held:

> Medical records are admissible under the hearsay rules as evidence of facts contained therein but not as evidence of medical opinion or diagnosis. A party may introduce medical records as evidence of facts contained therein without producing the person who made the notation in the record or the records custodian.

***Turner v. Valley Hous. Dev. Corp.***, 972 A.2d 531, 537 (Pa. Super. 2009) (citations, quotation marks, and brackets omitted). "[T]here is no legal support for the position ... that only a health care provider can testify as to statements made for purposes of medical treatment." ***Adams v. Rising Sun Med. Ctr.***, 257 A.3d 26, 37 (Pa. Super. 2020) (citing Pa.R.E. 803(4)). We have acknowledged that, in considering the admissibility of medical records under hearsay rules, "[t]he line between fact and opinion has been difficult to discern." ***Folger***, 876 A.2d at 1055. However, we observed that, in general,

> when the record reveals what is or is not present in the patient, or that a test occurred, the record reflects facts. On the other hand, when the record reflects

> what the presence or absence of something means, the record more likely reflects a medical diagnosis or opinion.

*Id.* at 1056.

*Kent v. Williams*, 315 A.3d 76 (non-precedential decision)(Pa. Super. Ct. 2024).

Here, Decedent's medical records contained physicians', nurses', and EMS providers' notations regarding facts associated with his physical health observed during medical encounters and examinations conducted within weeks of the execution of Decedent's Will. For example, the record dated August 20, 2022, included an examining physician's notations indicating, *inter alia*, Decedent's pain assessment scale score of 8 (severe pain), and his shortness of breath.[2] On August 21, 2022, an EMS report noted Decedent stated he was feeling increasingly weak and short of breath, nearly lost consciousness ("syncopized") when the EMS attempted to stand him up to go to the stretcher, and was "borderline hypoxic" at 92% blood oxygen level on room air. He began taking prescription oxycodone tablets for his pain on September 6, 2022, three days before the date the Will was executed, with instructions to "take by mouth 1 pill every 4 hours as needed."

The University of Pittsburgh Medical Center's medical record of Decedent's visit on September 11, 2022, just two days after the execution of Decedent's Will, notes he "is developing severe weakness. Having pain in the

_____

[2] Notably, however, the physician's notes also state that Decedent's "mood" and "behavior" were "normal."

- 13 -

sides of his abdomen, bilaterally. He is having difficulty tolerating oral intake." *See* R.R. 448. His pain score on that date was "10," the highest score possible. September 14, 2022, included a nurse's notations that Decedent had "increased work of breathing," and "generalized abdominal tenderness." Reproduced Record at 280.

According to Appellants, because the medical reports and the medical professionals' statements of fact appearing therein were generated in the ordinary course of business for the purpose of enabling Decedent to receive appropriate medical treatment, they were admissible under the hearsay exception within Rule 803(4) to show the facts of Decedent's health at such time. Furthermore, they assert the recorded facts of Decedent's severe pain, reliance on oxycodone prescribed for pain relief, shortness of breath, and knowledge of a terminal cancer diagnosis were relevant to the questions of whether he possessed a "weakened intellect" and whether, in that weakened state, he formed a "confidential relationship" with Wheeland marked by such a disparity in position that he placed complete trust in her advice and sought no other counsel, so as to give rise to a particular abuse of power in which she was able to exert undue influence over him in his final days.

As noted *supra*, while there is not a "bright-line test by which weakened intellect can be identified to a legal certainty," a testator may be found to have suffered from weakened intellect if he or she exhibited "persistent confusion, forgetfulness and disorientation." ***In re Estate of Smaling***, 80 A.3d 485, 497 (Pa. Super. 2013) (*en banc*). On this critical inquiry into Decedent's state

of mind, the trial court observed that nothing in his medical records indicated he exhibited any of these mental deficits. In fact, the one relevant physician's notation of record indicated that Decedent's "mood" and "behavior" were "normal." Other notations of record imply Decedent could respond to questions and report his symptoms during examinations, a fact acknowledged by Appellants. *See* Brief for Appellants, at 23.

Appellants sought to supplement their proffer of Decedent's weakened intellect with lay opinions offered by his son and daughter.[3] Daughter, who was 16 years old when Decedent executed his will, testified that he was "out of the ordinary," and "not together mental[ly]," and she answered in the affirmative when her counsel asked if Decedent seemed confused in his last weeks. N.T., 5/13/2024, at 9. Son, who was 23 years old at the time in question and worked as a learning support teacher while also attending college, testified that his father had "regressed to a nonverbal stage" by

---

[3] Lay opinions on a testator's weakened intellect may be admissible pursuant to Pa.R.E. 701, which states the following:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

September of 2022, but he acknowledged Decedent typically "was asleep or he was almost to a nonverbal stage where he wasn't saying a whole lot[]" when Son would arrive home at night, N.T. at 17. Son could not say whether his father's mental state changed after he started taking oxycodone. N.T. at 15.

The trial court found that Petitioners/Appellants had failed to carry their burden because "no evidence was presented, expert or otherwise, by the Co-Petitioners to present a *prima facie* case of weakened intellect or that undue influence was used in making the Will[,]" as no expert was presented and no witness to the execution of the Will was called to testify. TCO at 8. Guided by the foregoing authority requiring this Court to review the record in a light most favorable to an appellee, we discern no error with the trial court's factual findings and conclusion of law that Appellants failed to carry their burden to establish by clear and convincing evidence a *prima facie* showing of undue influence through clear and convincing evidence satisfying each prong of the tripartite test.

Specifically, we concur that the medical record evidence establishing the facts of Decedent's declining physical state did not, alone, support the inference that Decedent possessed a weakened intellect. As discussed, both the commentary to Pa.R.E. 803(4) and interpretative decisional law clearly state that going beyond the mere recitation of facts expressed in medical records to conclude what such facts mean is to offer an opinion or diagnosis that requires expert witness support.

Here, Appellants asked the trial court to infer from the reported facts of Decedent's declining physical health that he also possessed a compromised mental state, but no health care provider had included such an opinion that such facts meant he possessed a weakened intellect. Indeed, the only reference relating to Decedent's mental affect was a physician's note that his mood and behavior were normal.

Under the burden-shifting scheme before us, it was Appellants' burden to rebut the presumption that Decedent's properly executed will was free from undue influence by establishing each prong of the applicable tripartite test. Because they have not established with clear and convincing evidence that Decedent possessed a "weakened intellect" at the time he executed his will, we conclude the trial court did not err in finding Decedent was not subject to Wheeler's undue influence when he executed his will.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 08/26/2025